**44 LIQUOR MART, INC. and People's Super Liquor Stores, Inc., Plaintiffs,**

v.

**Kate F. RACINE, in her capacity as Rhode Island Liquor Control Administrator, Defendant,**

and

**Rhode Island Liquor Stores Association, Intervenor–Defendant.**

Civ. A. No. 92–0115 P.

United States District Court, D. Rhode Island.

Aug. 10, 1993.

Barry J. Kusinitz, Corrente, Brill & Kusinitz, Providence, RI, Evan T. Lawson, Lawson & Weitzen, Boston, MA, for plaintiffs.

Rebecca Tedford Partington, RI Atty. General's Office, Providence, RI, for defendant Racine.

William Gasbarro, Robert M. Brady, E. Providence, RI, for intervenor-defendant RI Liquor Stores.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

The case presents the question whether R.I.G.L. §§ 3–8–7 [1] and 3–8–8.1,[2] and Regulation 32 of the Rhode Island Liquor Control Administration,[3] which collectively prohibit off-premises advertising of the prices at which liquor stores sell alcoholic beverages, violate the First Amendment to the United

---

1. R.I.G.L. § 3–8–7 controls price advertising by licensees. It provides:

   No manufacturer, wholesaler, or shipper from without this state and *no holder of a license issued under the provisions of this title and chapter shall cause or permit the advertising in any manner whatsoever of the price of any malt beverage, cordials, wine or distilled liquor offered for sale in this state;* provided, however, that the provisions of this section shall not apply to price signs or tags attached to or placed on merchandise for sale within the licensed premises in accordance with rules and regulations of the department. (emphasis added).

2. R.I.G.L. § 3–8–8.1 controls the acceptance of price advertising by Rhode Island communications media and provides as follows:

   *No newspaper, periodical, radio or television broadcaster or broadcasting company or any other person, firm or corporation with a principal place of business in the state of Rhode Island which is engaged in the business of advertising or selling advertising time or space shall accept, publish, or broadcast any advertisement in this state of the price or make reference to the price of any alcoholic beverages.*

Any person who shall violate any of the provisions of this section shall be guilty of a misdemeanor and shall be punished for the first offense by a fine in the sum of fifty dollars ($50) and for each additional offense thereafter by a fine not exceeding the sum of one hundred dollars ($100). Publication or broadcast by any person in violation of the provisions of this section shall also be subject to injunctive proceedings in a court of competent jurisdiction on a complaint brought by a retail licensee, or an association of retail licensees.

   The provisions of this section shall not apply to any trade journal which is duly recognized and authorized to be exempt from the provisions of this section by the liquor control administrator. (emphasis added).

3. Regulation 32 of the Rules and Regulations of the Liquor Control Administrator was enacted to "enforce" the provisions of § 3–8–7. It provides, in pertinent part:

   No placard or sign of any kind which is visible from the exterior of any Class A [package store] premises licensed to sell at retail shall make reference to the price of any alcoholic beverage or mixture of alcoholic beverages.

States Constitution. Jurisdiction is premised on 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

For the reasons stated below, I hold these provisions invalid as an unconstitutional burden upon protected commercial speech.

## I. BACKGROUND

Plaintiff 44 Liquor Mart, Inc. ("44 Liquor Mart"), a Rhode Island corporation located in Johnston, Rhode Island, is a licensed retail alcohol dealer. Plaintiff People's Super Liquor Stores, Inc. ("People's"), a Massachusetts corporation, is a retail dealer of alcoholic beverages operating retail stores in New Bedford and Fairhaven, Massachusetts.

Defendant Kate F. Racine held the position of Liquor Control Administrator for the State of Rhode Island at the time this action was commenced. Anthony Arico currently holds the title of Acting Liquor Control Administrator. Intervenor–Defendant Rhode Island Liquor Stores Association is a trade group of small retail liquor stores in Rhode Island.

On December 17, 1991, Racine held a hearing to determine whether 44 Liquor Mart had violated R.I.G.L. § 3–8–7 and Liquor Control Administration Regulation 32, which prohibit off-premises advertising of alcohol beverage prices, by placing an advertisement headed "Thanksgiving Harvest" (Plaintiffs' Ex. 4) in a December 1991 edition of the *Providence Journal–Bulletin,* a daily newspaper in Rhode Island. The advertisement displayed bottles of named brand liquors. It also advertised: "State Line Chips" at $1.79, with the price highlighted in a burst form; "Peanuts" at 89 cents a pound with the exclamation "WOW" highlighted in a burst form; "Cigarettes: Cartons and Packs" at various prices for different sizes; and "Schweppes Mixers" at $1.29 a bottle. None of the alcoholic beverages showed any prices, but several of the "WOW" exclamations—highlighted in burst form—appeared next to the displayed bottles.

At the conclusion of the hearing, Racine determined that a violation had occurred. She fined 44 Liquor Mart $400.00, and ordered that the advertisement, as printed, cease to run. 44 Liquor Mart paid the fine on December 17, 1991. No appeal was taken to the Liquor Control Hearing Board as provided by R.I.G.L. § 3–3–5.

People's, which extensively uses price advertising in Massachusetts, where it is permitted, attempted on several occasions in 1991 and 1992 to place its advertisements, which include price information, in Rhode Island newspapers and other media outlets. It has been refused because of R.I.G.L. § 3–8–8.1, which expressly prohibits the Rhode Island media from advertising retail alcoholic beverage price information.

In addition to the above stated facts, the parties have stipulated to the following:

(1) other liquor licensees, as well as newspapers within the State, have been warned or fined for violations of the Rhode Island regulations;

(2) plaintiffs believe they will each realize an economic benefit of more than $100,000 per year if the price advertising ban is lifted;

(3) defendant Racine vigorously enforces the price advertising ban;

(4) Rhode Island permits all advertising of alcoholic beverages excepting references to price outside the licensed premises;

(5) the State prohibits communications media from accepting any advertisements that refer to prices at which alcoholic beverages are being sold in other states;

(6) Rhode Island communications media reach both Rhode Island and Massachusetts citizens;

(7) the proposed speech does not concern an illegal activity and presumably would not be false or misleading; and

(8) the state of Rhode Island has a substantial interest in regulating the sale of alcoholic beverages.

Defendant Racine defends the constitutionality of the State's ban on price advertising as a measure designed to promote temperance by directly reducing the consumption of alcohol by the citizens of Rhode Island.

## II.  FINDINGS OF FACT

The following findings of fact are drawn from the transcript of the March 11, 1993 hearing in this case and from my evaluation of two video-taped depositions submitted by agreement of the parties.

■ At the outset, I note a pronounced lack of unanimity among researchers who have studied the effects of alcohol advertising.  No less than twelve different conclusions have been reached regarding the impact of advertising on the general consumption of alcoholic beverages.  (Tr., 3/11/93, at 50–51).  Numerous studies have attempted to correlate the consumption of alcohol by the general public and certain discreet groups to permitted or proscribed advertising of various alcoholic beverages.  Only three that were called to the Court's attention, however, directly deal with price advertising:  Jon P. Nelson, *State Monopolies and Alcoholic Beverage Consumption*, 2 J.Reg. Econ. 83 (1990); Gary P. Wilcox, *The Effect of Price Advertising on Alcoholic Beverage Sales*, 25 J. Advertising Res. 33 (1985); and Stanley I. Ornstein and Dominique M. Hanssens, *Alcohol Control Laws and the Consumption of Distilled Spirits and Beer*, 12 J. Consumer Res. 200 (September 1985).  In this setting, experts for the respective parties testified.

Plaintiffs presented two expert witnesses: Dr. Reginald Smart, a Ph.D. in psychology and scientist with the Addiction Research Foundation in Toronto, Canada, and Dr. David J. Pittman, a Ph.D. in human development and professor of psychology at the Washington University in St. Louis.  Both experts agreed that some studies have shown that overall alcohol advertising has a slight effect on alcohol consumption.  (Tr., 3/11/93, at 50–51, 72; Pittman Dep., 11/10/92, at 12).  They each maintained, however, that there is no empirical evidence that the presence or absence of alcohol price advertising significantly affects levels of alcohol consumption.

Dr. Smart focused his opinion on price advertising.  He agreed with the three studies by Nelson, Wilson, and Ornstein and Hanssens, *supra*, which concluded that bans on price advertising have no effect on alcohol consumption.  Dr. Smart used Rhode Island as a classic example of the fallacy of conclusions to the contrary.  Rhode Island, a license state, which has a ban on alcohol price advertising, has "a fairly high level of alcohol consumption, about 2.86 gallons of absolute alcohol per person." (Tr. at 27).  It ranks in the upper 30 percent of the states in per capita consumption.  (Tr. at 64).  In other license states that allow price advertising, alcohol consumption is lower.  (Tr. at 65–66).

Dr. Smart also noted that on a national scale, over the past fifteen years, consumption levels generally have decreased even though overall advertising levels have increased.  (Tr. at 64).  True, the decline has been fairly small.  Nevertheless, it has been consistent year after year.  (Tr. at 64).  According to Dr. Smart, the mere fact that price advertising may lower sales prices does not mean that per capita consumption will be influenced.  It is his conclusion that consumption is influenced by the disposable income available to the individual buyer;  that is, the available money remaining after payment of living expenses.  (Tr. at 45, 73).

As noted above, Dr. Smart conceded that some researchers have concluded that overall alcohol advertising may have *some* effect on levels of consumption.  (Tr. at 50–51, 72).  He based his own opinion, however, on research that shows that overall alcohol advertising does not appear to have much effect on alcohol consumption or problems.  (Tr. at 24, 72).  In addition, he explained, because price advertising is only one part of the total advertising phenomenon, there is no reason to believe that a change in that factor alone would have much of an impact on levels of consumption.  (Tr. at 24).

Dr. Smart bolstered his opinion by referring to a 1985 Federal Trade Commission study that found, after reviewing various research, no evidence to believe alcohol advertising significantly affects alcohol abuse.  (Tr. at 28).  In addition, Dr. Smart supported his testimony with a critique of studies on general alcohol advertising that he believed were inapposite and, at any rate, flawed.  (Tr. at 69–71).

In concluding this recitation of the pertinent aspects of Dr. Smart's testimony, I rec-

ord verbatim particularly persuasive passages:

A. Well, that study [by Dr. Nelson] was important, I think, in that it established quite clearly that for all states there was no relationship between a price ad ban and no price ad ban when it came to alcohol consumption. States with price ad bans didn't have lower consumption than those who had no such ban and with regard to prices, it's also interesting that Nelson has shown that overall prices are the same in control and license states and here I think we have to remember that license states, almost all license states in the U.S. except for three have no ban on—on prices.[4] Now, one might expect that the prices in license states should be higher than in control states or lower but what we see is essentially no difference. That too suggests to me that probably the price ad ban has no impact.

\* \* \* \* \* \*

Also [Atkin and Block] asked people to recall their television advertising or their television viewing but in the Strickland study, respondents reported the number of times they watched various television programs and then investigators determined from records how much total advertising and how much total advertising each person saw and I think they should reduce the problems. They also improved the sampling of students. They had a stratified sampling procedure. Generally I think the Strickland results are based on a stronger study and they reach conclusions which were quite different than Atkin and Block.

Q. And what were Strickland's conclusions?

A. Strickland's conclusion was that there was no overall correlation between alcohol consumption or problems and alcohol advertising.

Q. Now, when you were being cross examined, you were asked about a number of different studies and statements that you had reported in your paper. Now, were those statements and studies relating to price advertising or to advertising in general?

A. The great majority of them were about advertising in general and not about price advertising at all.

Q. When you were cross-examined, you indicated that you agreed that consumers would travel to obtain lower prices for alcoholic beverages. Do you recall that?

A. Yes, I do.

Q. Now, do you equate the fact that consumers would travel to obtain lower prices for alcoholic beverages with consumers consuming more alcoholic beverages?

A. I don't know of any empirical study that's really shown that, that because people will travel to get alcoholic beverages at a lower price that means they'll necessarily drink more. What—What I'm aware of are studies that show that people generally decide how much money they have to spend on alcoholic beverages per week or per month. Then they tend to spend that amount and if they can spend it in one way, they'll do it and in another way they'll do that as well.

(Tr. at 68–71).

Dr. Pittman's testimony concurred with Dr. Smart's as to the insignificance of price advertising on alcohol consumption. (Pittman Dep., 11/5/92, at 20). Dr. Pittman further testified that many other factors besides price influence alcohol consumption levels, including religion, cultural patterns, peer pressure, family make-up, and ethnic background. (Pittman Dep., 11/5/92, at 21–22, Pittman Dep. 11/10/92, at 13–14). Ultimately, he stated that he was unaware of any empirical evidence that would support the conclusion that banning alcohol price advertising promotes temperance. (Pittman Dep., 11/5/92, at 25).

In rebuttal, the defendant presented evidence—although not directly focused on price advertising—that some research groups believe that alcohol advertising leads to increased overall consumption. In her

4. There are certain states that do not license retailers but rather operate state controlled retail stores. (Tr. at 67–68).

cross-examination of Dr. Smart, counsel for the defendant elicited testimony that the distinguished economist John Kenneth Galbraith and the American Medical Association ("AMA") agree with such a conclusion. (Tr. at 33–37). In 1986, Dr. Smart conceded, the AMA advocated a ban on alcohol advertising with the statement that such advertising affects youthful consumption and influences both brand preferences and the total volume of alcoholic beverages consumed by the public. (Tr. at 33–34). In addition, Dr. Smart acknowledged that advertising has cumulative effects that are difficult to detect in studies, and that research studies have been varied and equivocal because it is a difficult topic to research. (Tr. at 39–40).

Defendant's expert, Dr. Henry Saffer, a Ph.D. in economics and professor of economics at Kean College in New Jersey, testified that alcohol advertising bans affect alcohol abuse. He stated that in a study he conducted of 17 countries over 14 years,[5] those countries that banned all broadcast advertisements of alcohol had the lowest values for alcohol consumption, liver cirrhosis, mortality rates and motor vehicle fatality rates. (Saffer Deposition, 11/16/92, at 19). Dr. Saffer's testimony, and the conclusions of his international study, are accurately recited by the defendant in her post-trial memorandum:

> Countries with more restrictive advertising policies had the lowest increases in consumption. Countries with bans of spirits advertising have about 16% lower alcohol consumption than countries with no bans. Countries with bans on beer and wine advertising have about 11% lower alcohol consumption than countries with bans only on spirits advertising. Countries with bans on spirits advertising have about 10% lower motor vehicle fatality rates than countries with no bans. Countries with bans on beer and wine advertising have about 23% lower motor vehicle fatality rates than countries with bans only on spirits advertising. The data show that alcohol consumption is related to advertising bans and alcohol price. Liver cirrhosis mortality rates are less consistently relat-

ed to alcohol advertising bans, but are clearly related to alcohol price.

> The ban on price advertising promotes temperance in two ways, by increasing the "search time" involved in finding the best price on alcoholic beverages, and by keeping the actual price of alcoholic beverages higher than they would be if price were allowed to be advertised. Dr. Saffer explained the "search cost" theory as follows: The average price for alcohol would be lower if people could more easily find lower prices. The price advertising ban creates a greater variance of prices in the state than you would have without a ban, which gives people an incentive to shop around, increasing the search costs. If there were no ban on price advertising, the variance of prices would probably decrease and there would be less search time. Dr. Saffer testified that higher prices result in lower alcohol consumption. If the price advertising ban were abolished, it would lower average prices and increase consumption.

Defendant's Post Trial Memorandum at 5–6.

I do not find Dr. Saffer's testimony persuasive. After reviewing his deposition, I conclude that he did not, in any meaningful way, consider a number of variables that influence the public's consumption of alcohol. He did not use any data recognizing ethnic background, income and education levels, or the difference of attitudes and drinking habits that exist in different countries. (Saffer Dep. at 35–42). His complicated studies, in part, correlated more banning of alcoholic beverage advertising with lower levels of consumption, liver cirrhosis and highway fatalities. (Saffer Dep. at 40–41). Yet, the information he had did not deal only with liver cirrhosis caused by alcohol. He admitted that "environmental factors" can have an effect on this ailment but did not control his study for this factor. (Saffer Dep. at 41). He also acknowledged that he had no information in his foreign country study as to which traffic fatalities were caused by non-

5. Henry Saffer, *Alcohol advertising bans and alcohol abuse: An international perspective*, 10 J. Health Econ. 65 (1991) (Saffer Dep. Ex. J).

alcohol related factors. (Saffer Dep. at 41–42).

I also conclude that while Dr. Saffer knew that the national alcoholic beverage consumption trend for the past ten years has declined, he had no idea of what the trend has been in Rhode Island. (Saffer Dep. at 44). Nor had he made any determination as to how much lower prices might be expected to go if the price advertising ban were lifted. (Saffer Dep. at 45–46). He conceded that many other factors would have to be considered. (Saffer Dep. at 46).

Significantly, Dr. Saffer conceded that the objective of lowering consumption of alcohol by banning price advertising could be accomplished by establishing minimum prices and/or by increasing sales taxes on alcoholic beverages. (Saffer Dep. at 31–32). And while he obviously considered both empirical and theoretical works that move "towards the question of what a socially optimal price is," he was unable to say what that price would be for Rhode Island. (Saffer Dep. at 32).

In addition, Dr. Saffer agreed that banning advertising would not necessarily result in optimal liquor prices. (Saffer Dep. at 34). He further acknowledged that if a company could increase its market share by advertising prices, it could increase its own profits without affecting overall consumption. (Saffer Dep. at 50–51). Thus, plaintiffs' expectation of realizing additional profits through price advertising has no necessary relationship to increased overall consumption. Finally, Dr. Saffer's studies did not deal with the precise issues presented in this litigation.

Based on the record presented, I find as a fact that Rhode Island's off-premises liquor price advertising ban has no significant impact on levels of alcohol consumption in Rhode Island.[6]

## III. RHODE ISLAND PRECEDENT

As a threshold matter, I must note that in *S & S Liquor Mart, Inc. v. Pastore*, 497 A.2d 729 (R.I.1985) and *Rhode Island Liquor Stores Ass'n v. Evening Call Pub. Co.*, 497 A.2d 331 (R.I.1985), the Rhode Island Supreme Court addressed the constitutionality of precisely the same statutes that are challenged here. In both of these cases, the Supreme Court held that the price advertising ban was a valid exercise of the State's powers under the Twenty-first Amendment[7] and did not violate liquor retailers' First Amendment rights. The defendant argues that this Court should defer to the reasoning and opinion of the Rhode Island Supreme Court and uphold the price advertising ban.

The specter of a direct conflict between the decision of a federal court and the previous decisions of the highest state court in the jurisdiction in which the federal court sits raises delicate issues of comity. Nevertheless, the decisions of the Rhode Island Supreme Court, while persuasive, do not bind this federal court as to issues of federal constitutional law. *See Grantham v. Avondale Indus.*, 964 F.2d 471, 473 (5th Cir.1992) ("It is beyond cavil that we are not bound by a state court's interpretation of federal law regardless of whether our jurisdiction is based on diversity of citizenship or a federal question."); *In re Asbestos Litigation*, 829 F.2d 1233, 1237 (3rd Cir.1987), *cert. denied*, 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988) ("The federal district court ... takes as its authority on federal constitutional issues, decisions of the United States Courts of Appeals and the United States Supreme Court, rather than those of the state supreme court.").

Circuit Judge Selya, as a trial judge, enunciated this principle when he stated: "[I]n construing a state statute, a federal court

---

6. With respect to the narrow issue in this case regarding price advertising of alcoholic beverages, I agree with the various conclusions of Dr. Smart. I wish to emphasize, however, that I make no findings as to the effect that a total or partial ban on general alcohol advertising would have on consumption levels in Rhode Island.

7. Section 1 of the Twenty-first Amendment repealed the Eighteenth Amendment's prohibition of the manufacture, sale, or transportation of liquor. Section 2 provides:

    The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

must defer to the highest court of a state as the best arbiter of state law." *Donahue v. Rhode Island Dept. of Mental Health, Retardation & Hospitals*, 632 F.Supp. 1456, 1478 (D.R.I.1986) (citing *Commissioner v. Estate of Bosch*, 387 U.S. 456, 462, 87 S.Ct. 1776, 1781, 18 L.Ed.2d 886 (1967) and *Ragan v. Merchants Transfer & Warehouse Co.*, 337 U.S. 530, 534, 69 S.Ct. 1233, 1235, 93 L.Ed. 1520 (1949)). Such deference, however, "involves the meaning of the enactment; once the meaning is established, the question of whether or not the ordinance passes constitutional muster is one within the primacy of the federal courts." *Donahue*, 632 F.Supp. at 1478.

I also note that plaintiffs' challenge in this case is readily distinguishable from *S & S Liquor* and *Evening Call* due to the extensive expert testimony and factual record presented. The Rhode Island Supreme Court did not have the benefit of a fully developed factual record and conceded that "[i]t may be that some day, in some litigated case, evidence will be adduced that will support the proposition that these advertising restrictions do not further temperance objectives." *S & S Liquor Mart*, 497 A.2d at 734.

However desirable comity may be, it cannot trump where a federal court is confronted with an issue involving the United States Constitution, "raised by persons who were not parties in the state litigation." *Joseph v. Blair*, 482 F.2d 575, 579 n. 4 (4th Cir.1973), *cert. denied*, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974). Thus, it is manifest that I must decide for myself the constitutionality of the statutes at issue.

## IV. DISCUSSION

The parties agree that Rhode Island's alcohol price advertising ban implicates plaintiffs' constitutional interests in commercial speech. In order to place my factual findings in the proper context, it is necessary to review the United States Supreme Court's pronouncements as to the level of protection afforded such speech by the First Amendment.

8. Purely commercial advertisements were once considered to be outside the protection of the First Amendment. *See Valentine v. Chrestensen*, 316 U.S. 52, 54, 62 S.Ct. 920, 921, 86 L.Ed. 1262

## A. The *Central Hudson* Test

Commercial speech now has a definite niche in the pantheon of rights protected by the First Amendment.[8] In a recent opinion, the Supreme Court summarized the general principles underlying the protection of commercial speech:

> The commercial market place, like other spheres of our social and cultural life, provides a forum where ideas and information flourish. Some of the ideas and information are vital, some of slight worth. But the general rule is that the speaker and the audience, not the government, assess the value of the information presented. Thus, even a communication that does no more than propose a commercial transaction is entitled to the coverage of the First Amendment.

*Edenfield v. Fane*, —— U.S. ——, ——, 113 S.Ct. 1792, 1798, 123 L.Ed.2d 543 (1993).

Even while acknowledging this constitutional protection, the Supreme Court's decisions have recognized the " 'common sense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978) (citing *Virginia Pharmacy Bd. v. Citizens Consumer Council*, 425 U.S. 748, 771 n. 24, 96 S.Ct. 1817, 1830 n. 24, 48 L.Ed.2d 346 (1976)). These distinctions have led the Court to conclude that "[t]he Constitution ... affords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *U.S. v. Edge Broadcasting Co.*, —— U.S. ——, ——, 113 S.Ct. 2696, 2703, 125 L.Ed.2d 345 (1993) (citing *Board of Trustees v. Fox*, 492 U.S. 469, 477, 109 S.Ct. 3028, 3033, 106 L.Ed.2d 388 (1989), *Central Hudson Gas & Electric Corp. v. Public Service Com.*, 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980), and *Ohralik*, 436 U.S. at 456, 98 S.Ct. at 1918)).

(1942) (Constitution imposes no restraint upon the government with respect to the regulation of "purely commercial advertising").

In *Central Hudson, supra,* the Supreme Court set out a four-part test for assessing government restrictions on commercial speech:

[First] ... [the commercial speech] at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566, 100 S.Ct. at 2351. This four-part analysis has endured as the constitutional benchmark in commercial speech cases.

With respect to the burden of proof, the Supreme Court recently reaffirmed that:

It is well established that "[t]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 71, n. 20 [103 S.Ct. 2875, 2883, n. 20], 77 L.Ed.2d 469 (1983); *Fox,* 492 U.S., at 480, 109 S.Ct., at 3035. This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.

*Edenfield,* —— U.S. at ——, 113 S.Ct. at 1800. Thus, state legislatures must take their constitutional obligations seriously by demonstrating that regulatory measures which burden commercial speakers directly serve concrete and substantial state interests.

### B. *Central Hudson* and the Twenty-first Amendment

In the case at hand, the parties do not dispute that the price advertising at issue constitutes commercial speech within the protection of the First Amendment. The parties also stipulate that plaintiffs' proposed price advertising concerns lawful activity and will not be misleading. Further, they agree that Rhode Island has a substantial interest in fostering temperance and that under the Twenty-first Amendment the State has the right to regulate " 'the sale, and the incidents thereof, of alcoholic beverages, and to protect its citizens from the evils incident to alcohol.' " *S & S Liquor,* 497 A.2d at 732 (quoting *Oklahoma Telecasters Ass'n v. Crisp,* 699 F.2d 490, 500 (10th Cir.1983), *rev'd on other grounds sub nom. Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984)). I accept the parties' conclusions and find that the first two prongs of the *Central Hudson* test have been satisfied.

The parties vigorously debate the third and fourth elements of the *Central Hudson* analysis. Specifically, they dispute whether the Twenty-first Amendment requires a shift in both the level and allocation of the traditional burden of proof.

■ Relying on the State's considerable authority in the area of alcohol regulation (and, indeed, its ability to ban the sale of alcohol altogether) under the Twenty-first Amendment, the defendant contends that the legislature's chosen scheme need only be "reasonably related to," rather than "directly advance," its stated ends in order to withstand constitutional scrutiny. · Defendant also contends that, because of the Twenty-first Amendment, the price advertising regulation is entitled to an "added presumption" in favor of its validity. *New York State Liquor Authority v. Bellanca,* 452 U.S. 714, 718, 101 S.Ct. 2599, 2602, 69 L.Ed.2d 357 (1981) (quoting *California v. LaRue,* 409 U.S. 109, 118, 93 S.Ct. 390, 397, 34 L.Ed.2d 342 (1972)). Following the reasoning of the Rhode Island Supreme Court in *S & S Liquor* and *Evening Call,* the defendant suggests that this "added presumption" works to shift the burden of proof to the plaintiffs to show that "these statutes are unconstitutional beyond a reasonable doubt." Defendant's Post–Trial Memorandum at 7.

Respectfully, I find that defendant's reasoning overstates the law in this area, abrogating too broadly other constitutional provisions. The Twenty-first Amendment cannot be read in isolation as a supreme provision impinging all other constitutional rights.

■ The Twenty-first Amendment is an exception to the Commerce Clause and gives the states broad regulatory authority over interstate commerce of liquor. *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 330, 84 S.Ct. 1293, 1296, 12 L.Ed.2d 350 (1964). This regulatory authority, however, is not absolute and can be limited by the federal commerce power in appropriate situations. *Id.* at 332, 84 S.Ct. at 1298. *See also California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110, 100 S.Ct. 937, 945, 63 L.Ed.2d 233 (1980) (the states' power to regulate alcoholic beverages advertising is subject to federal anti-trust laws); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 275, 104 S.Ct. 3049, 3057, 82 L.Ed.2d 200 (1984) ("economic protectionism" of local alcoholic beverages violates the Commerce Clause); *Healy v. Beer Inst.*, 491 U.S. 324, 334, 109 S.Ct. 2491, 2498, 105 L.Ed.2d 275 (1989) (state regulation of alcoholic beverage prices is invalid under the Commerce Clause when it affects prices in other states).

■ Nor does the Twenty-first Amendment necessarily override constitutional guaranties found in the Bill of Rights. In *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), Justice Brennan, writing for the majority, stated:

> Once passing beyond consideration of the Commerce Clause, the relevance of the Twenty-first Amendment to other constitutional provisions becomes increasingly doubtful. As one commentator has remarked: "Neither the text nor the history of the Twenty-first Amendment suggests that it qualifies individual rights protected by the Bill of Rights and the Fourteenth Amendment where the sale or use of liquor is concerned."

*Id.* at 206, 97 S.Ct. at 461 (quoting P. Brest, *Processes of Constitutional Decisionmaking, Cases and Materials* 258 (1975)). *See also Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 122 n. 5, 103 S.Ct. 505, 510 n. 5, 74 L.Ed.2d 297 (1982) (state's power under Twenty-first Amendment could not impinge upon Establishment Clause of the First Amendment); *Wisconsin v. Constantineau*, 400 U.S. 433, 436, 91 S.Ct. 507, 509, 27 L.Ed.2d 515 (1971) (posting the names of excessive drinkers in retail liquor outlets violated due process).[9]

The strongest authority for the proposition that the Twenty-first Amendment may alter the balance in the *Central Hudson* analysis can be found in *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972) and *New York State Liquor Authority v. Bellanca*, 452 U.S. 714, 101 S.Ct. 2599, 69 L.Ed.2d 357 (1981), the cases chiefly relied upon by the Rhode Island Supreme Court in *S & S Liquor* and *Evening Call.*

In *LaRue*, the U.S. Supreme Court upheld a state liquor regulation prohibiting simulated sex acts and the showing of films and pictures depicting such acts in licensed clubs. In *Bellanca*, the Court relied heavily upon *LaRue* in upholding a state liquor regulation prohibiting topless dancing in licensed establishments. In both cases, however, expression was only incidentally burdened. The *LaRue* Court was concerned with the conduct rather than the communication:

> [A]s the mode of expression moves from the printed page to the commission of public acts that may themselves violate valid penal statutes, the scope of permissible state regulations significantly increases. States may sometimes proscribe expression that is directed to the accomplishment of an end that the State has declared to be illegal when such expression consists, in part, of "conduct" or "action."

409 U.S. at 117, 93 S.Ct. at 396 (citations omitted).

In the present action, we are not concerned with conduct or "public acts" that violate "valid penal statutes," but rather with pure speech that occurs off the licensed premises. *LaRue* and *Bellanca* do not mandate the application of a deferential standard of review in every case wherein a state, in the exercise of its Twenty-first Amendment powers, impinges on the First Amendment.

**9.** For a skillful summary of the historical interplay between the First and Twenty-first Amendments, see Richard S. Mandel, Note, *Liquor Advertising: Resolving the Clash Between The First and Twenty–First Amendments*, 57 N.Y.U.L.Rev. 157 (1984).

Nor do I believe that *Queensgate Invest. Co. v. Liquor Control Com.*, 459 U.S. 807, 103 S.Ct. 31, 74 L.Ed.2d 45 (1982), the only decision of the U.S. Supreme Court to address the relationship between the Twenty-first Amendment and commercial speech doctrine, compels a different result. In *Queensgate,* the Supreme Court summarily dismissed for want of a substantial federal question an appeal of an Ohio Supreme Court decision upholding the constitutionality of a statute imposing a partial ban on liquor price advertising. Since *Queensgate* relied upon a different factual predicate and, as a summary dismissal lacks a reasoned opinion, I cannot accept it as any stronger authority for the defendant than *LaRue* or *Bellanca.* *See Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977) (summary dispositions are binding precedent only on "the precise issues presented and necessarily decided").[10]

Other circuits, relying on *LaRue, Bellanca* and *Queensgate,* have applied a deferential *Central Hudson* standard and upheld statutes prohibiting liquor advertising against First Amendment challenges. *See Oklahoma Telecasters Ass'n v. Crisp,* 699 F.2d 490 (10th Cir.1983), *rev'd on other grounds sub nom. Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580

(1984)[11] and *Dunagin v. Oxford,* 718 F.2d 738 (5th Cir.1983) (en banc), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984). I do not find these cases persuasive in the present context. In addition to their reliance on *LaRue* and *Bellanca* to give an "added presumption" of constitutionality to state regulation of pure commercial speech pursuant to the Twenty-first Amendment, these cases concerned total bans on liquor advertising. They simply do not deal with price advertising in the present factual setting.

In sum, I find that the Twenty-first Amendment does not require a modification of either the level or allocation of the burden of proof in commercial speech cases involving the regulation of the sale of alcoholic beverages. *See Michigan Beer & Wine Wholesalers Ass'n v. Attorney General,* 142 Mich.App. 294, 370 N.W.2d 328, 335 (1985), *cert. denied,* 479 U.S. 939, 107 S.Ct. 420, 93 L.Ed.2d 371 (1986) (Twenty-first Amendment does not require court to treat restraints on speech any differently than if alcoholic beverages were not involved).[12] Consequently, the State bears the burden of justifying the alcohol price advertising ban by demonstrating that it "directly advances" its interest in promoting temperance and "is not more extensive

---

**10.** I note that the Supreme Court cited *Queensgate* in its most recent commercial speech opinion, *U.S. v. Edge Broadcasting, supra.* In that case, the Supreme Court cited *Queensgate* in support of the narrow proposition that a legislative body is entitled to determine that promotional advertising of a product (lottery gambling) prohibited in one state, but available in a neighboring state, undermines the prohibiting state's policy against gambling, even if the prohibiting state's advertising audience is not "wholly unaware of the lottery's existence" in the neighboring state. ―― U.S. at ――, 113 S.Ct. at 2696. Importantly, the Court went on to note that "[i]f there is an immediate connection between advertising and demand, and the ... regulation decreases advertising, it stands to reason that the policy of decreasing demand for [the product] is correspondingly advanced." *Id.*

In the liquor advertising context, the above reasoning supports the notion that it "stands to reason" that a state regulation decreasing the amount of alcohol advertising, would directly advance the state's interest in decreasing demand for alcohol. As noted above, however, the regulations at issue in this case make no attempt to reduce the amount of alcohol advertising, but

merely proscribe the dissemination of truthful price information. Again, I make no determination here as to the potential constitutionality of a total or partial ban on alcohol advertising in Rhode Island.

**11.** The Tenth Circuit upheld Oklahoma's ban on alcohol advertising in *Oklahoma Telecasters Association, supra.* The Supreme Court granted *certiorari* to consider the petitioner's claim that the ban was not a valid restriction on commercial speech. Ultimately, however, the Court decided the case on a ground raised by the Federal Communications Commission as *Amicus Curiae,* holding that the Oklahoma ban on the retransmission of liquor advertisements in out-of-state signals by cable operators was preempted by federal regulation of cable broadcasting. *See Capital Cities Cable, Inc. v. Crisp,* 467 U.S. at 697, 104 S.Ct. at 2699. The Supreme Court never reached the First Amendment commercial speech issues.

**12.** The Michigan intermediate state court, faced with a substantially similar prohibition on alcohol price advertising, applied *Central Hudson* and concluded that the prohibition was an unconstitutional restriction on commercial speech.

than is necessary to serve that interest." *Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351.

## C. Applying the *Central Hudson* Test

As noted above, the parties agree that plaintiffs' proposed speech concerns lawful activity and would not be misleading. They also agree that the State has a substantial interest in promoting temperance. Thus, I need only consider the last two prongs of the *Central Hudson* analysis. The Supreme Court has described these steps as " 'basically involv[ing] a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends.' " *Edge Broadcasting,* —— U.S. at ——, 113 S.Ct. at 2704 (quoting *Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 341, 106 S.Ct. 2968, 2977, 92 L.Ed.2d 266 (1986)). There must be an "immediate connection," however, between the prohibition and the government's asserted end. *Central Hudson,* 447 U.S. at 569, 100 S.Ct. at 2353; *Edge Broadcasting,* —— U.S. at ——, 113 S.Ct. at 2707. And if the means-end connection is "tenuous" or "highly speculative," the regulation cannot survive constitutional scrutiny. *Central Hudson,* 447 U.S. at 569, 100 S.Ct. at 2353.

■ Unlike a number of cases in the commercial speech area, the link between alcohol price advertising and increased per-capita consumption is not self-evident. *See, e.g., Posadas,* 478 U.S. at 341–42, 106 S.Ct. at 2976–77 (link between ban on gambling advertising and level of gambling self-evident); *Central Hudson,* 447 U.S. at 569, 100 S.Ct. at 2353 (link between advertising ban and sales self-evident); *Dunagin v. Oxford,* 718 F.2d at 747–49 & n. 8 (link between overall advertising and increased alcohol use deemed self-evident). Nor do I believe this is a case where this Court should defer to the legislature on the basis of precedent which has already established that the legislature's chosen means directly advances the asserted ends. *See, e.g., Metromedia, Inc. v. San Diego,* 453 U.S. 490, 509 & n. 14, 101 S.Ct. 2882, 2893 & n. 14, 69 L.Ed.2d 800 (1981) (plurality relied on established line of cases

to ratify legislature's judgment that banning commercial billboards would improve traffic safety).[13]

In this case, the State has failed to carry its burden of proof to show a direct correlation between the price advertising ban and reduced consumption of alcohol. As discussed *supra* Part II, the plaintiffs' expert testimony demonstrates that the alcohol price advertising ban has no appreciable impact on levels of consumption in Rhode Island. At best, price advertising is one factor among many that influence alcohol consumption patterns.

Even if defendant's burden of proof on this issue were tempered somewhat by the State's substantial Twenty-first Amendment interest in regulating the evils incident to the sale and transportation of alcohol, the evidence presented does not satisfy the *Central Hudson* test. The State has simply not shown an "immediate connection" between the price advertising ban and reduced consumption.

■ I also find that the price advertising ban is more extensive than necessary to serve the State's asserted interest. The defendant claims that the ban increases the "search costs" of consumers and reduces the incidence of "price wars" between retailers, thus providing an "artificial floor" for liquor prices. Common sense tells us that a lifting of the ban on price advertising will lead to a more competitive market. But any concern that such competition will result in unacceptably low liquor price levels can be controlled by the imposition of higher sales taxes or minimum consumer prices. Such measures would directly serve the State's asserted ends without burdening commercial speech.

In his concurring opinion in *Central Hudson,* Justice Blackmun emphasized the critical role of an informed public in scrutinizing governmental policy choices:

I seriously doubt whether suppression of information concerning the availability and price of a legally offered product is ever a permissible way for the State to "dampen"

---

**13.** For the reasons discussed *supra* Part III, I do not rely on the Rhode Island Supreme Court's deference to the legislature in *S & S Liquor Mart* and *Evening Call.*

demand for or use of the product. Even though "commercial" speech is involved, such a regulatory measure strikes at the heart of the First Amendment. This is because it is a covert attempt by the State to manipulate the choices of its citizens, not by persuasion or direct regulation, but by depriving the public of the information needed to make a free choice.

447 U.S. at 574–75, 100 S.Ct. at 2356.

In this case, the State has failed to demonstrate the necessary reasonable 'fit' between its policy objectives and its chosen means. While it may have been "reasonable" or "rational," as defendant argues, for the legislature to assume a correlation between the price advertising ban and reduced consumption, the Supreme Court has recently explained that such "rational basis" scrutiny is not to be applied when deciding the constitutionality of restrictions on commercial speech:

[W]hile we have rejected the "least-restrictive-means" test for judging restrictions on commercial speech, so too have we rejected mere rational basis review. A regulation need not be "absolutely the least severe that will achieve the desired end," *Fox, supra,* 492 U.S., at 480, 109 S.Ct., at 3035, but if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the "fit" between ends and means is reasonable.

*Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, —— n. 13, 113 S.Ct. 1505, 1510 n. 13, 123 L.Ed.2d 99 (1993). Here, it is evident that the State's ends may be easily accomplished by direct regulations controlling the retail prices of alcoholic beverages.

## V. CONCLUSION

■ Commercial speech enjoys somewhat less First Amendment protection from governmental encroachment than other forms of speech. Nevertheless, under *Central Hudson,* a state must justify restrictions on truthful, nonmisleading commercial speech by demonstrating that its actions "directly advance" a substantial state interest and are no more extensive than necessary to serve that interest.

For the reasons stated above, I hold that §§ 3–8–7 and 3–8–8.1 of the Rhode Island General Laws and Regulation 32 of the Rhode Island Liquor Control Administration do not directly advance the State's interest in reducing overall consumption of alcohol in Rhode Island and are more extensive than necessary to serve the State's interest. I find that the statutes impermissibly restrict commercial speech and are unconstitutional.

SO ORDERED.