# 44 LIQUORMART, INC., ET AL. *v.* RHODE ISLAND ET AL.

No. 94–1140.   Argued November 1, 1995—Decided May 13, 1996

486

STEVENS, J., announced the judgment of the Court, and delivered the opinion of the Court with respect to Parts I, II, and VII, in which SCALIA, KENNEDY, SOUTER, THOMAS, and GINSBURG, JJ., joined, the opinion of the Court with respect to Part VIII, in which SCALIA, KENNEDY, SOUTER, and GINSBURG, JJ., joined, an opinion with respect to Parts III and V, in

which KENNEDY, SOUTER, and GINSBURG, JJ., joined, an opinion with respect to Part VI, in which KENNEDY, THOMAS, and GINSBURG, JJ., joined, and an opinion with respect to Part IV, in which KENNEDY and GINSBURG, JJ., joined. SCALIA, J., *post*, p. 517, and THOMAS, J., *post*, p. 518, filed opinions concurring in part and concurring in the judgment. O'CONNOR, J., filed an opinion concurring in the judgment, in which REHNQUIST, C. J., and SOUTER and BREYER, JJ., joined, *post*, p. 528.

*Evan T. Lawson* argued the cause and filed briefs for petitioners.

*Rebecca Tedford Partington*, Special Assistant Attorney General, argued the cause and filed a brief for respondent State of Rhode Island. *Lauren E. Jones, Caroline Cole Cornwell, William P. Gasbarro*, and *Robert M. Brady* filed a brief for respondent Rhode Island Liquor Stores Association.*

JUSTICE STEVENS announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, VII, and VIII, an opinion with respect to Parts III and V, in which JUSTICE KENNEDY, JUSTICE SOUTER, and

---

*Briefs of *amici curiae* urging reversal were filed for the American Advertising Federation et al. by *Richard E. Wiley, Andrew Krulwich, Howard H. Bell, Daniel E. Troy, John F. Kamp, David S. Versfelt, Slade Metcalf*, and *Robert L. Sherman;* for the American Civil Liberties Union et al. by *Marjorie Heins* and *Steven R. Shapiro;* for the Association of National Advertisers, Inc., et al. by *Burt Neuborne, Gilbert H. Weil, Valerie Schulte*, and *John F. Kamp;* for the Beer Institute et al. by *John J. Walsh, Steven G. Brody*, and *Mary Elizabeth Taylor;* for the Institute for Justice by *William H. Mellor III* and *Clint Bolick;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo, Paul D. Kamenar*, and *Martin H. Redish.*

Briefs of *amici curiae* urging affirmance were filed for the Council of State Governments et al. by *Richard Ruda* and *Lee Fennell;* and for the Malt Beverage Distributors Association of Pennsylvania.

*P. Cameron DeVore, John F. Sturm, René P. Milam, Ralph P. Huber, Jerry S. Birenz, Andrew A. Merdek, Jonathan E. Thackeray*, and *George Freeman* filed a brief for the Newspaper Association of America et al. as *amici curiae.*

JUSTICE GINSBURG join, an opinion with respect to Part VI, in which JUSTICE KENNEDY, JUSTICE THOMAS, and JUSTICE GINSBURG join, and an opinion with respect to Part IV, in which JUSTICE KENNEDY and JUSTICE GINSBURG join.

Last Term we held that a federal law abridging a brewer's right to provide the public with accurate information about the alcoholic content of malt beverages is unconstitutional. *Rubin* v. *Coors Brewing Co.,* 514 U. S. 476, 491 (1995). We now hold that Rhode Island's statutory prohibition against advertisements that provide the public with accurate information about retail prices of alcoholic beverages is also invalid. Our holding rests on the conclusion that such an advertising ban is an abridgment of speech protected by the First Amendment and that it is not shielded from constitutional scrutiny by the Twenty-first Amendment.[1]

## I

In 1956, the Rhode Island Legislature enacted two separate prohibitions against advertising the retail price of alcoholic beverages. The first applies to vendors licensed in Rhode Island as well as to out-of-state manufacturers, wholesalers, and shippers. It prohibits them from "advertising in any manner whatsoever" the price of any alcoholic beverage offered for sale in the State; the only exception is for price tags or signs displayed with the merchandise within licensed premises and not visible from the street.[2] The second stat-

---

[1] Although the text of the First Amendment states that "Congress shall make no law . . . abridging the freedom of speech, or of the press," the Amendment applies to the States under the Due Process Clause of the Fourteenth Amendment. See *Board of Ed., Island Trees Union Free School Dist. No. 26* v. *Pico,* 457 U. S. 853, 855, n. 1 (1982); *Grosjean* v. *American Press Co.,* 297 U. S. 233, 244 (1936); *Gitlow* v. *New York,* 268 U. S. 652, 666 (1925).

[2] Rhode Island Gen. Laws § 3–8–7 (1987) provides:

"Advertising price of malt beverages, cordials, wine or distilled liquor.— No manufacturer, wholesaler, or shipper from without this state and no holder of a license issued under the provisions of this title and chapter

ute applies to the Rhode Island news media. It contains a categorical prohibition against the publication or broadcast of any advertisements—even those referring to sales in other States—that "make reference to the price of any alcoholic beverages."[3]

In two cases decided in 1985, the Rhode Island Supreme Court reviewed the constitutionality of these two statutes. In *S&S Liquor Mart, Inc.* v. *Pastore*, 497 A. 2d 729, a liquor retailer located in Westerly, Rhode Island, a town that borders the State of Connecticut, having been advised that his license would be revoked if he advertised his prices in a Connecticut paper, sought to enjoin enforcement of the first statute. Over the dissent of one justice, the court upheld the statute. It concluded that the statute served the substantial state interest in "'the promotion of temperance.'"[4] *Id.*, at

---

shall cause or permit the advertising in any manner whatsoever of the price of any malt beverage, cordials, wine or distilled liquor offered for sale in this state; provided, however, that the provisions of this section shall not apply to price signs or tags attached to or placed on merchandise for sale within the licensed premises in accordance with rules and regulations of the department."

Regulation 32 of the Rules and Regulations of the Liquor Control Administrator provides that no placard or sign that is visible from the exterior of a package store may make any reference to the price of any alcoholic beverage. App. 2 to Brief for Petitioners.

[3] Rhode Island Gen. Laws § 3–8–8.1 (1987) provides:

"Price advertising by media or advertising companies unlawful.—No newspaper, periodical, radio or television broadcaster or broadcasting company or any other person, firm or corporation with a principal place of business in the state of Rhode Island which is engaged in the business of advertising or selling advertising time or space shall accept, publish, or broadcast any advertisement in this state of the price or make reference to the price of any alcoholic beverages. Any person who shall violate any of the provisions of this section shall be guilty of a misdemeanor . . . ." The statute authorizes the liquor control administrator to exempt trade journals from its coverage. *Ibid.*

[4] "We also have little difficulty in finding that the asserted governmental interests, herein described as the promotion of temperance and the reasonable control of the traffic in alcoholic beverages, are substantial. We note,

737. Because the plaintiff failed to prove that the statute did not serve that interest, the court held that he had not carried his burden of establishing a violation of the First Amendment. In response to the dissent's argument that the court had placed the burden on the wrong party, the majority reasoned that the Twenty-first Amendment gave the statute "'an added presumption [of] validity.'" *Id.*, at 732. Although that presumption had not been overcome in that case, the State Supreme Court assumed that in a future case the record might "support the proposition that these advertising restrictions do not further temperance objectives." *Id.*, at 734.

In *Rhode Island Liquor Stores Assn. v. Evening Call Pub. Co.*, 497 A. 2d 331, the plaintiff association[5] sought to enjoin the publisher of the local newspaper in Woonsocket, Rhode Island, from accepting advertisements disclosing the retail price of alcoholic beverages being sold across the state line in Millville, Massachusetts. In upholding the injunction, the

---

parenthetically, that the word 'temperance' is oftentimes mistaken as a synonym for 'abstinence.' It is not. Webster's Third New International Dictionary (1961) defines 'temperance' as 'moderation in or abstinence from the use of intoxicating drink.' The Rhode Island Legislature has the authority, derived from the state's inherent police power, to enact a variety of laws designed to suppress intemperance or to minimize the acknowledged evils of liquor traffic. Thus, there can be no question that these asserted interests are indeed substantial. *Oklahoma Telecasters Association v. Crisp*, 699 F. 2d at 500." *S&S Liquor Mart, Inc. v. Pastore*, 497 A. 2d, at 733–734.

In her dissent in *Rhode Island Liquor Stores Assn. v. Evening Call Pub. Co.*, 497 A. 2d 331 (R. I. 1985), Justice Murray suggested that the advertising ban was motivated, at least in part, by an interest in protecting small retailers from price competition. *Id.*, at 342, n. 10. This suggestion is consistent with the position taken by respondent Rhode Island Liquor Stores Association in this case. We, however, accept the State Supreme Court's identification of the relevant state interest served by the legislation.

[5] The plaintiff in that case is a respondent in this case and has filed other actions enforcing the price advertising ban. See *id.*, at 333.

State Supreme Court adhered to its reasoning in the *Pastore* case and rejected the argument that the statute neither "directly advanced" the state interest in promoting temperance, nor was "more extensive than necessary to serve that interest" as required by this Court's decision in *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 563 (1980). It assumed the existence of other, "perhaps more effective means" of achieving the State's "goal of temperance," but concluded that it was "not unreasonable for the State of Rhode Island to believe that price advertising will result in increased sales of alcoholic beverages generally." *Rhode Island Liquor Stores Assn.* v. *Evening Call Pub. Co.*, 497 A. 2d, at 336.

## II

Petitioners 44 Liquormart, Inc. (44 Liquormart), and Peoples Super Liquor Stores, Inc. (Peoples), are licensed retailers of alcoholic beverages. Petitioner 44 Liquormart operates a store in Rhode Island and petitioner Peoples operates several stores in Massachusetts that are patronized by Rhode Island residents. Peoples uses alcohol price advertising extensively in Massachusetts, where such advertising is permitted, but Rhode Island newspapers and other media outlets have refused to accept such ads.

Complaints from competitors about an advertisement placed by 44 Liquormart in a Rhode Island newspaper in 1991 generated enforcement proceedings that in turn led to the initiation of this litigation. The advertisement did not state the price of any alcoholic beverages. Indeed, it noted that "State law prohibits advertising liquor prices." The ad did, however, state the low prices at which peanuts, potato chips, and Schweppes mixers were being offered, identify various brands of packaged liquor, and include the word "WOW" in large letters next to pictures of vodka and rum bottles. Based on the conclusion that the implied reference to bargain prices for liquor violated the statutory ban on

price advertising, the Rhode Island Liquor Control Administrator assessed a $400 fine.

After paying the fine, 44 Liquormart, joined by Peoples, filed this action against the administrator in the Federal District Court seeking a declaratory judgment that the two statutes and the administrator's implementing regulations violate the First Amendment and other provisions of federal law. The Rhode Island Liquor Stores Association was allowed to intervene as a defendant and in due course the State of Rhode Island replaced the administrator as the principal defendant. The parties stipulated that the price advertising ban is vigorously enforced, that Rhode Island permits "all advertising of alcoholic beverages excepting references to price outside the licensed premises," and that petitioners' proposed ads do not concern an illegal activity and presumably would not be false or misleading. *44 Liquor Mart, Inc.* v. *Racine,* 829 F. Supp. 543, 545 (RI 1993). The parties disagreed, however, about the impact of the ban on the promotion of temperance in Rhode Island. On that question the District Court heard conflicting expert testimony and reviewed a number of studies.

In his findings of fact, the District Judge first noted that there was a pronounced lack of unanimity among researchers who have studied the impact of advertising on the level of consumption of alcoholic beverages. He referred to a 1985 Federal Trade Commission study that found no evidence that alcohol advertising significantly affects alcohol abuse. Another study indicated that Rhode Island ranks in the upper 30% of States in per capita consumption of alcoholic beverages; alcohol consumption is lower in other States that allow price advertising. After summarizing the testimony of the expert witnesses for both parties, he found "as a fact that Rhode Island's off-premises liquor price advertising ban has no significant impact on levels of alcohol consumption in Rhode Island." *Id.,* at 549.

As a matter of law, he concluded that the price advertising ban was unconstitutional because it did not "directly advance" the State's interest in reducing alcohol consumption and was "more extensive than necessary to serve that interest." *Id.*, at 555. He reasoned that the party seeking to uphold a restriction on commercial speech carries the burden of justifying it and that the Twenty-first Amendment did not shift or diminish that burden. Acknowledging that it might have been reasonable for the state legislature to "assume a correlation between the price advertising ban and reduced consumption," he held that more than a rational basis was required to justify the speech restriction, and that the State had failed to demonstrate a reasonable "'fit'" between its policy objectives and its chosen means. *Ibid.*

The Court of Appeals reversed. 39 F. 3d 5 (CA1 1994). It found "inherent merit" in the State's submission that competitive price advertising would lower prices and that lower prices would produce more sales. *Id.*, at 7. Moreover, it agreed with the reasoning of the Rhode Island Supreme Court that the Twenty-first Amendment gave the statutes an added presumption of validity. *Id.*, at 8. Alternatively, it concluded that reversal was compelled by this Court's summary action in *Queensgate Investment Co.* v. *Liquor Control Comm'n of Ohio*, 459 U. S. 807 (1982). See 39 F. 3d, at 8. In that case the Court dismissed the appeal from a decision of the Ohio Supreme Court upholding a prohibition against off-premises advertising of the prices of alcoholic beverages sold by the drink. See *Queensgate Investment Co.* v. *Liquor Control Comm'n of Ohio*, 69 Ohio St. 2d 361, 433 N. E. 2d 138 (1982).

*Queensgate* has been both followed and distinguished in subsequent cases reviewing the validity of similar advertising bans.[6] We are now persuaded that the importance of

---

[6] In *Dunagin* v. *Oxford*, 718 F. 2d 738 (1983), the Fifth Circuit distinguished our summary action in *Queensgate* in considering the constitutionality of a sweeping state restriction on outdoor liquor adver-

the First Amendment issue, as well the suggested relevance of the Twenty-first Amendment, merits more thorough analysis than it received when we refused to accept jurisdiction of the *Queensgate* appeal. We therefore granted certiorari. 514 U. S. 1095 (1995).

## III

Advertising has been a part of our culture throughout our history. Even in colonial days, the public relied on "commercial speech" for vital information about the market. Early newspapers displayed advertisements for goods and services on their front pages, and town criers called out prices in public squares. See J. Wood, The Story of Advertising 21, 45–69, 85 (1958); J. Smith, Printers and Press Freedom 49 (1988). Indeed, commercial messages played such a central role in public life prior to the founding that Benjamin Franklin authored his early defense of a free press in support of his decision to print, of all things, an advertisement for voyages to Barbados. Franklin, An Apology for Print-

---

tising. The court explained that *Queensgate* did not control because it involved a far narrower alcohol advertising regulation. *Id.,* at 745–746. By contrast, in *Oklahoma Telecasters Assn.* v. *Crisp,* 699 F. 2d 490, 495–497 (1983), rev'd on other grounds *sub nom. Capital Cities Cable, Inc.* v. *Crisp,* 467 U. S. 691, 697 (1984), the Tenth Circuit relied on *Queensgate* in considering a prohibition against broadcasting alcohol advertisements. The Court of Appeals concluded that *Queensgate* stood for the proposition that the Twenty-first Amendment gives the State greater authority to regulate liquor advertising than the First Amendment would otherwise allow. 699 F. 2d, at 495–497.

Other than the two Rhode Island Supreme Court decisions upholding the constitutionality of the statutes at issue in this case, only one published state court opinion has considered our summary action in *Queensgate* in passing on a liquor advertising restriction. See *Michigan Beer & Wine Wholesalers Assn.* v. *Attorney General,* 142 Mich. App. 294, 370 N. W. 2d 328 (1985). There, the Michigan Court of Appeals concluded that *Queensgate* did not control because it involved a far narrower restriction on liquor advertising than the one that Michigan had imposed. 142 Mich. App., at 304–305, 370 N. W. 2d, at 333–335.

ers, June 10, 1731, reprinted in 2 Writings of Benjamin Franklin 172 (1907).

In accord with the role that commercial messages have long played, the law has developed to ensure that advertising provides consumers with accurate information about the availability of goods and services. In the early years, the common law, and later, statutes, served the consumers' interest in the receipt of accurate information in the commercial market by prohibiting fraudulent and misleading advertising. It was not until the 1970's, however, that this Court held that the First Amendment protected the dissemination of truthful and nonmisleading commercial messages about lawful products and services. See generally Kozinski & Banner, The Anti-History and Pre-History of Commercial Speech, 71 Texas L. Rev. 747 (1993).

In *Bigelow* v. *Virginia*, 421 U. S. 809 (1975), we held that it was error to assume that commercial speech was entitled to no First Amendment protection or that it was without value in the marketplace of ideas. *Id.*, at 825–826. The following Term in *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976), we expanded on our holding in *Bigelow* and held that the State's blanket ban on advertising the price of prescription drugs violated the First Amendment.

*Virginia Bd. of Pharmacy* reflected the conclusion that the same interest that supports regulation of potentially misleading advertising, namely, the public's interest in receiving accurate commercial information, also supports an interpretation of the First Amendment that provides constitutional protection for the dissemination of accurate and nonmisleading commercial messages. We explained:

> "Advertising, however tasteless and excessive it sometimes may seem, is nonetheless dissemination of information as to who is producing and selling what product, for what reason, and at what price. So long as we pre-

serve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable." 425 U. S., at 765.[7]

The opinion further explained that a State's paternalistic assumption that the public will use truthful, nonmisleading commercial information unwisely cannot justify a decision to suppress it:

"There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them. If they are truly open, nothing prevents the 'professional' pharmacist from marketing his own assertedly superior product, and contrasting it with that of the low-cost, high-volume prescription drug retailer. But the choice among these alternative approaches is not ours to make or the Virginia General Assembly's. It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us." Id., at 770.

On the basis of these principles, our early cases uniformly struck down several broadly based bans on truthful, nonmisleading commercial speech, each of which served ends unre-

---

[7] By contrast, the First Amendment does not protect commercial speech about unlawful activities. See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U. S. 376 (1973).

lated to consumer protection.[8]   Indeed, one of those cases
expressly likened the rationale that *Virginia Bd. of Pharmacy* employed to the one that Justice Brandeis adopted
in his concurrence in *Whitney* v. *California,* 274 U. S. 357
(1927).   See *Linmark Associates, Inc.* v. *Willingboro,* 431
U. S. 85, 97 (1977).   There, Justice Brandeis wrote, in explaining his objection to a prohibition of *political* speech,
that "the remedy to be applied is more speech, not enforced
silence.   Only an emergency can justify repression."   *Whitney,* 274 U. S., at 377; see also *Carey* v. *Population Services
Int'l,* 431 U. S. 678, 701 (1977) (applying test for suppressing
political speech set forth in *Brandenburg* v. *Ohio,* 395 U. S.
444, 447 (1969)).

At the same time, our early cases recognized that the
State may regulate some types of commercial advertising
more freely than other forms of protected speech.   Specifically, we explained that the State may require commercial
messages to "appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive," *Virginia Bd. of Pharmacy,* 425 U. S., at 772, n. 24, and that it may restrict some
forms of aggressive sales practices that have the potential to
exert "undue influence" over consumers, see *Bates* v. *State
Bar of Ariz.,* 433 U. S. 350, 366 (1977).

*Virginia Bd. of Pharmacy* attributed the State's authority
to impose these regulations in part to certain "commonsense

---

[8] See *Bates* v. *State Bar of Ariz.,* 433 U. S. 350, 355 (1977) (ban on lawyer
advertising); *Carey* v. *Population Services Int'l,* 431 U. S. 678, 700 (1977)
(ban on contraceptive advertising); *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 92–94 (1977) (ban on "For Sale" signs); *Virginia Bd. of
Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748
(1976) (ban on prescription drug prices); *Bigelow* v. *Virginia,* 421 U. S. 809,
825 (1975) (ban on abortion advertising).   Although *Linmark* involved a
prohibition against a particular means of advertising the sale of one's
home, we treated the restriction as if it were a complete ban because it
did not leave open "satisfactory" alternative channels of communication.
431 U. S., at 92–94.

differences" that exist between commercial messages and other types of protected expression. 425 U. S., at 771, n. 24. Our opinion noted that the greater "objectivity" of commercial speech justifies affording the State more freedom to distinguish false commercial advertisements from true ones, *ibid.*, and that the greater "hardiness" of commercial speech, inspired as it is by the profit motive, likely diminishes the chilling effect that may attend its regulation, *ibid.*

Subsequent cases explained that the State's power to regulate commercial transactions justifies its concomitant power to regulate commercial speech that is "linked inextricably" to those transactions. *Friedman* v. *Rogers*, 440 U. S. 1, 10, n. 9 (1979); *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 456 (1978) (commercial speech "occurs in an area traditionally subject to government regulation"). As one commentator has explained: "The entire commercial speech doctrine, after all, represents an accommodation between the right to speak and hear expression *about* goods and services and the right of government to regulate the sales *of* such goods and services." L. Tribe, American Constitutional Law § 12–15, p. 903 (2d ed. 1988). Nevertheless, as we explained in *Linmark*, the State retains less regulatory authority when its commercial speech restrictions strike at "the substance of the information communicated" rather than the "commercial aspect of [it]—with offerors communicating offers to offerees." 431 U. S., at 96; *Carey* v. *Population Services Int'l*, 431 U. S., at 701, n. 28.

In *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980), we took stock of our developing commercial speech jurisprudence. In that case, we considered a regulation "completely" banning all promotional advertising by electric utilities. *Ibid.* Our decision acknowledged the special features of commercial speech but identified the serious First Amendment concerns that attend blanket advertising prohibitions that do not protect consumers from commercial harms.

Five Members of the Court recognized that the state interest in the conservation of energy was substantial, and that there was "an immediate connection between advertising and demand for electricity." *Id.*, at 569. Nevertheless, they concluded that the regulation was invalid because respondent commission had failed to make a showing that a more limited speech regulation would not have adequately served the State's interest. *Id.*, at 571.[9]

In reaching its conclusion, the majority explained that although the special nature of commercial speech may require less than strict review of its regulation, special concerns arise from "regulations that entirely suppress commercial speech in order to pursue a nonspeech-related policy." *Id.*, at 566, n. 9. In those circumstances, "a ban on speech could screen from public view the underlying governmental policy." *Ibid.* As a result, the Court concluded that "special care" should attend the review of such blanket bans, and it pointedly remarked that "in recent years this Court has not approved a blanket ban on commercial speech unless the expression itself was flawed in some way, either because it was deceptive or related to unlawful activity." *Ibid.*[10]

---

[9] In other words, the regulation failed the fourth step in the four-part inquiry that the majority announced in its opinion. It wrote:

"In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Central Hudson*, 447 U. S., at 566.

[10] The Justices concurring in the judgment adopted a somewhat broader view. They expressed "doubt whether suppression of information concerning the availability and price of a legally offered product is ever a permissible way for the State to 'dampen' the demand for or use of the product." *Id.*, at 574. Indeed, Justice Blackmun believed that even

## IV

As our review of the case law reveals, Rhode Island errs in concluding that *all* commercial speech regulations are subject to a similar form of constitutional review simply because they target a similar category of expression. The mere fact that messages propose commercial transactions does not in and of itself dictate the constitutional analysis that should apply to decisions to suppress them. See *Rubin* v. *Coors Brewing Co.*, 514 U. S., at 491–494 (STEVENS, J., concurring in judgment).

When a State regulates commercial messages to protect consumers from misleading, deceptive, or aggressive sales practices, or requires the disclosure of beneficial consumer information, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech and therefore justifies less than strict review. However, when a State entirely prohibits the dissemination of truthful, nonmisleading commercial messages for reasons unrelated to the preservation of a fair bargaining process, there is far less reason to depart from the rigorous review that the First Amendment generally demands.

Sound reasons justify reviewing the latter type of commercial speech regulation more carefully. Most obviously, complete speech bans, unlike content-neutral restrictions on the time, place, or manner of expression, see *Kovacs* v. *Cooper*, 336 U. S. 77, 89 (1949), are particularly dangerous because they all but foreclose alternative means of disseminating certain information.

Our commercial speech cases have recognized the dangers that attend governmental attempts to single out certain messages for suppression. For example, in *Linmark*, 431 U. S., at 92–94, we concluded that a ban on "For Sale" signs

"though 'commercial' speech is involved, such a regulation strikes at the heart of the First Amendment." *Ibid.*

was "content based" and failed to leave open "satisfactory" alternative channels of communication; see also *Virginia Bd. of Pharmacy*, 425 U. S., at 771. Moreover, last Term we upheld a 30-day prohibition against a certain form of legal solicitation largely because it left so many channels of communication open to Florida lawyers. *Florida Bar* v. *Went For It, Inc.*, 515 U. S. 618, 633–634 (1995).[11]

The special dangers that attend complete bans on truthful, nonmisleading commercial speech cannot be explained away by appeals to the "commonsense distinctions" that exist between commercial and noncommercial speech. *Virginia Bd. of Pharmacy*, 425 U. S., at 771, n. 24. Regulations that suppress the truth are no less troubling because they target objectively verifiable information, nor are they less effective because they aim at durable messages. As a result, neither the "greater objectivity" nor the "greater hardiness" of truthful, nonmisleading commercial speech justifies reviewing its complete suppression with added deference. *Ibid.*

It is the State's interest in protecting consumers from "commercial harms" that provides "the typical reason why commercial speech can be subject to greater governmental regulation than noncommercial speech." *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 426 (1993). Yet bans

---

[11] "Florida permits lawyers to advertise on prime-time television and radio as well as in newspapers and other media. They may rent space on billboards. They may send untargeted letters to the general population, or to discrete segments thereof. There are, of course, pages upon pages devoted to lawyers in the Yellow Pages of Florida telephone directories. These listings are organized alphabetically and by area of specialty. See generally Rule 4–7.2(a), Rules Regulating The Florida Bar ('[A] lawyer may advertise services through public media, such as a telephone directory, legal directory, newspaper or other periodical, billboards, and other signs, radio, television, and recorded messages the public may access by dialing a telephone number, or through written communication not involving solicitation as defined in rule 4–7.4'); *The Florida Bar: Petition to Amend the Rules Regulating The Florida Bar—Advertising Issues*, 571 So. 2d, at 461." 515 U. S., at 633–634.

that target truthful, nonmisleading commercial messages rarely protect consumers from such harms.[12]  Instead, such bans often serve only to obscure an "underlying governmental policy" that could be implemented without regulating speech.  *Central Hudson*, 447 U. S., at 566, n. 9.  In this way, these commercial speech bans not only hinder consumer choice, but also impede debate over central issues of public policy.  See *id.*, at 575 (Blackmun, J., concurring in judgment).[13]

Precisely because bans against truthful, nonmisleading commercial speech rarely seek to protect consumers from either deception or overreaching, they usually rest solely on the offensive assumption that the public will respond "irrationally" to the truth.  *Linmark*, 431 U. S., at 96.  The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.  That teaching applies equally to state attempts to deprive consumers of accurate information about their chosen products:

> "The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish.  Some of the ideas and information are vital, some of slight worth.  But the general rule is that the speaker and the audience, not the gov-

---

[12] In *Discovery Network*, we held that the city's categorical ban on commercial newsracks attached too much importance to the distinction between commercial and noncommercial speech.  After concluding that the esthetic and safety interests served by the newsrack ban bore no relationship whatsoever to the prevention of commercial harms, we rejected the State's attempt to justify its ban on the sole ground that it targeted commercial speech.  See 507 U. S., at 428.

[13] This case bears out the point.  Rhode Island seeks to reduce alcohol consumption by increasing alcohol price; yet its means of achieving that goal deprives the public of their chief source of information about the reigning price level of alcohol.  As a result, the State's price advertising ban keeps the public ignorant of the key barometer of the ban's effectiveness: the alcohol beverages' prices.

ernment, assess the value of the information presented. Thus, even a communication that does no more than propose a commercial transaction is entitled to the coverage of the First Amendment. See *Virginia State Bd. of Pharmacy, supra,* at 762." *Edenfield* v. *Fane,* 507 U. S. 761, 767 (1993).

See also *Linmark,* 431 U. S., at 96 (1977); *Rubin* v. *Coors Brewing Co.,* 514 U. S., at 497–498 (STEVENS, J., concurring in judgment); Tribe, American Constitutional Law § 12–2, at 790, and n. 11.

V

In this case, there is no question that Rhode Island's price advertising ban constitutes a blanket prohibition against truthful, nonmisleading speech about a lawful product. There is also no question that the ban serves an end unrelated to consumer protection. Accordingly, we must review the price advertising ban with "special care," *Central Hudson,* 447 U. S., at 566, n. 9, mindful that speech prohibitions of this type rarely survive constitutional review, *ibid.*

The State argues that the price advertising prohibition should nevertheless be upheld because it directly advances the State's substantial interest in promoting temperance, and because it is no more extensive than necessary. Cf. *id.,* at 566. Although there is some confusion as to what Rhode Island means by temperance, we assume that the State asserts an interest in reducing alcohol consumption.[14]

---

[14] Before the District Court, the State argued that it sought to reduce consumption among irresponsible drinkers. App. 67. In its brief to this Court, it equates its interest in promoting temperance with an interest in reducing alcohol consumption among all drinkers. See, *e. g.,* Brief for Respondents 28. The Rhode Island Supreme Court has characterized the State's interest in "promoting temperance" as both "the state's interest in reducing the consumption of liquor," *S&S Liquormart, Inc.* v. *Pastore,* 497 A. 2d 729, 734 (1985), and the State's interest in discouraging "excessive consumption of alcoholic beverages," *id.,* at 735. A state statute declares the ban's purpose to be "the promotion of temperance and for the rea-

In evaluating the ban's effectiveness in advancing the State's interest, we note that a commercial speech regulation "may not be sustained if it provides only ineffective or remote support for the government's purpose." *Id.*, at 564. For that reason, the State bears the burden of showing not merely that its regulation will advance its interest, but also that it will do so "to a material degree." *Edenfield*, 507 U. S., at 771; see also *Rubin* v. *Coors Brewing Co.*, 514 U. S., at 486–488. The need for the State to make such a showing is particularly great given the drastic nature of its chosen means—the wholesale suppression of truthful, non-misleading information. Accordingly, we must determine whether the State has shown that the price advertising ban will *significantly* reduce alcohol consumption.

We can agree that common sense supports the conclusion that a prohibition against price advertising, like a collusive agreement among competitors to refrain from such advertising,[15] will tend to mitigate competition and maintain prices at a higher level than would prevail in a completely free market. Despite the absence of proof on the point, we can even agree with the State's contention that it is reasonable to assume that demand, and hence consumption throughout the market, is somewhat lower whenever a higher, noncompetitive price level prevails. However, without any findings of fact, or indeed any evidentiary support whatsoever, we cannot agree with the assertion that the price advertising ban will significantly advance the State's interest in promoting temperance.

---

sonable control of the traffic in alcoholic beverages." R. I. Gen. Laws § 3–1–5 (1987).

[15] See, *e. g.*, *Business Electronics Corp.* v. *Sharp Electronics Corp.*, 485 U. S. 717, 735 (1988) (considering restriction on price advertising as evidence of Sherman Act violation); *United States* v. *Sealy, Inc.*, 388 U. S. 350, 355 (1967) (same); *Blackburn* v. *Sweeney*, 53 F. 3d 825, 828 (CA7 1995) (considering restrictions on the location of advertising as evidence of Sherman Act violation).

Although the record suggests that the price advertising ban may have some impact on the purchasing patterns of temperate drinkers of modest means, 829 F. Supp., at 546, the State has presented no evidence to suggest that its speech prohibition will *significantly* reduce marketwide consumption.[16] Indeed, the District Court's considered and uncontradicted finding on this point is directly to the contrary. *Id.,* at 549.[17] Moreover, the evidence suggests that the abusive drinker will probably not be deterred by a marginal price increase, and that the true alcoholic may simply reduce his purchases of other necessities.

In addition, as the District Court noted, the State has not identified what price level would lead to a significant reduction in alcohol consumption, nor has it identified the amount

---

[16] Petitioners' stipulation that they each expect to realize a $100,000 benefit per year if the ban is lifted is not to the contrary. App. 47. The stipulation shows only that petitioners believe they will be able to compete more effectively for existing alcohol consumers if there is no ban on price advertising. It does not show that they believe either the number of alcohol consumers, or the number of purchases by those consumers, will increase in the ban's absence. Indeed, the State's own expert conceded that "plaintiffs' expectation of realizing additional profits through price advertising has no necessary relationship to increased overall consumption." 829 F. Supp., at 549.

Moreover, we attach little significance to the fact that some studies suggest that people budget the amount of money that they will spend on alcohol. 39 F. 3d 5, 7 (CA1 1994). These studies show only that, in a competitive market, people will tend to search for the cheapest product in order to meet their budgets. The studies do not suggest that the amount of money budgeted for alcohol consumption will remain fixed in the face of a marketwide price increase.

[17] Although the Court of Appeals concluded that the regulation directly advanced the State's interest, it did not dispute the District Court's conclusion that the evidence suggested that, at most, a price advertising ban would have a marginal impact on overall alcohol consumption. *Id.,* at 7–8; cf. *Michigan Beer & Wine Wholesalers Assn.* v. *Attorney General,* 142 Mich. App., at 311, 370 N. W. 2d, at 336 (explaining that "any additional impact on the level of consumption attributable to the absence of price advertisements would be negligible").

that it believes prices would decrease without the ban. *Ibid.* Thus, the State's own showing reveals that any connection between the ban and a significant change in alcohol consumption would be purely fortuitous.

As is evident, any conclusion that elimination of the ban would significantly increase alcohol consumption would require us to engage in the sort of "speculation or conjecture" that is an unacceptable means of demonstrating that a restriction on commercial speech directly advances the State's asserted interest. *Edenfield,* 507 U. S., at 770.[18] Such speculation certainly does not suffice when the State takes aim at accurate commercial information for paternalistic ends.

The State also cannot satisfy the requirement that its restriction on speech be no more extensive than necessary. It is perfectly obvious that alternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the State's goal of promoting temperance. As the State's own expert conceded, higher prices can be maintained either by direct regulation or by increased taxation. 829 F. Supp., at 549. Per capita purchases could be limited as is the case with prescription drugs. Even educational campaigns focused on the problems of excessive, or even moderate, drinking might prove to be more effective.

As a result, even under the less than strict standard that generally applies in commercial speech cases, the State has failed to establish a "reasonable fit" between its abridgment of speech and its temperance goal. *Board of Trustees of State Univ. of N. Y. v. Fox,* 492 U. S. 469, 480 (1989); see also

---

[18] Outside the First Amendment context, we have refused to uphold alcohol advertising bans premised on similarly speculative assertions about their impact on consumption. See *Capital Cities Cable, Inc. v. Crisp,* 467 U. S., at 715–716 (holding ban pre-empted by Federal Communications Commission regulations); *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.,* 445 U. S. 97 (1980) (holding ban violated the Sherman Act). It would be anomalous if the First Amendment were more tolerant of speech bans than federal regulations and statutes.

*Rubin* v. *Coors Brewing Co.*, 514 U. S., at 491 (explaining that defects in a federal ban on alcohol advertising are "further highlighted by the availability of alternatives that would prove less intrusive to the First Amendment's protections for commercial speech"); *Linmark*, 431 U. S., at 97 (suggesting that the State use financial incentives or counterspeech, rather than speech restrictions, to advance its interests). It necessarily follows that the price advertising ban cannot survive the more stringent constitutional review that *Central Hudson* itself concluded was appropriate for the complete suppression of truthful, nonmisleading commercial speech. 447 U. S., at 566, n. 9.

## VI

The State responds by arguing that it merely exercised appropriate "legislative judgment" in determining that a price advertising ban would best promote temperance. Relying on the *Central Hudson* analysis set forth in *Posadas de Puerto Rico Associates* v. *Tourism Co. of P. R.*, 478 U. S. 328 (1986), and *United States* v. *Edge Broadcasting Co.*, 509 U. S. 418 (1993), Rhode Island first argues that, because expert opinions as to the effectiveness of the price advertising ban "go both ways," the Court of Appeals correctly concluded that the ban constituted a "reasonable choice" by the legislature. 39 F. 3d, at 7. The State next contends that precedent requires us to give particular deference to that legislative choice because the State could, if it chose, ban the sale of alcoholic beverages outright. See *Posadas*, 478 U. S., at 345–346. Finally, the State argues that deference is appropriate because alcoholic beverages are so-called "vice" products. See *Edge*, 509 U. S., at 426; *Posadas*, 478 U. S., at 346–347. We consider each of these contentions in turn.

The State's first argument fails to justify the speech prohibition at issue. Our commercial speech cases recognize some room for the exercise of legislative judgment. See *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 507–508 (1981). However, Rhode Island errs in concluding that *Edge* and

*Posadas* establish the degree of deference that its decision to impose a price advertising ban warrants.

In *Edge,* we upheld a federal statute that permitted only those broadcasters located in States that had legalized lotteries to air lottery advertising. The statute was designed to regulate advertising about an activity that had been deemed illegal in the jurisdiction in which the broadcaster was located. 509 U. S., at 433–434. Here, by contrast, the commercial speech ban targets information about entirely lawful behavior.

*Posadas* is more directly relevant. There, a five-Member majority held that, under the *Central Hudson* test, it was "up to the legislature" to choose to reduce gambling by suppressing in-state casino advertising rather than engaging in educational speech. *Posadas,* 478 U. S., at 344. Rhode Island argues that this logic demonstrates the constitutionality of its own decision to ban price advertising in lieu of raising taxes or employing some other less speech-restrictive means of promoting temperance.

The reasoning in *Posadas* does support the State's argument, but, on reflection, we are now persuaded that *Posadas* erroneously performed the First Amendment analysis. The casino advertising ban was designed to keep truthful, nonmisleading speech from members of the public for fear that they would be more likely to gamble if they received it. As a result, the advertising ban served to shield the State's anti-gambling policy from the public scrutiny that more direct, nonspeech regulation would draw. See *id.,* at 351 (Brennan, J., dissenting).

Given our longstanding hostility to commercial speech regulation of this type, *Posadas* clearly erred in concluding that it was "up to the legislature" to choose suppression over a less speech-restrictive policy. The *Posadas* majority's conclusion on that point cannot be reconciled with the unbroken line of prior cases striking down similarly broad regulations on truthful, nonmisleading advertising when non-speech-

related alternatives were available. See *id.*, at 350 (Brennan, J., dissenting) (listing cases); Kurland, Posadas de Puerto Rico v. Tourism Company: "'Twas Strange, 'Twas Passing Strange; 'Twas Pitiful, 'Twas Wondrous Pitiful," 1986 S. Ct. Rev. 1, 12–15.

Because the 5-to-4 decision in *Posadas* marked such a sharp break from our prior precedent, and because it concerned a constitutional question about which this Court is the final arbiter, we decline to give force to its highly deferential approach. Instead, in keeping with our prior holdings, we conclude that a state legislature does not have the broad discretion to suppress truthful, nonmisleading information for paternalistic purposes that the *Posadas* majority was willing to tolerate. As we explained in *Virginia Bd. of Pharmacy,* "[i]t is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us." 425 U. S., at 770.

We also cannot accept the State's second contention, which is premised entirely on the "greater-includes-the-lesser" reasoning endorsed toward the end of the majority's opinion in *Posadas.* There, the majority stated that "the greater power to completely ban casino gambling necessarily includes the lesser power to ban advertising of casino gambling." 478 U. S., at 345–346. It went on to state that "*because* the government could have enacted a wholesale prohibition of [casino gambling] it is permissible for the government to take the less intrusive step of allowing the conduct, but reducing the demand through restrictions on advertising." *Id.,* at 346. The majority concluded that it would "surely be a strange constitutional doctrine which would concede to the legislature the authority to totally ban a product or activity, but deny to the legislature the authority to forbid the stimulation of demand for the product or activity through advertising on behalf of those who would profit from such increased demand." *Ibid.* On the basis of

these statements, the State reasons that its undisputed authority to ban alcoholic beverages must include the power to restrict advertisements offering them for sale.

In *Rubin* v. *Coors Brewing Co.*, 514 U. S. 476 (1995), the United States advanced a similar argument as a basis for supporting a statutory prohibition against revealing the alcoholic content of malt beverages on product labels. We rejected the argument, noting that the statement in the *Posadas* opinion was made only after the majority had concluded that the Puerto Rican regulation "survived the *Central Hudson* test." 514 U. S., at 483, n. 2. Further consideration persuades us that the "greater-includes-the-lesser" argument should be rejected for the additional and more important reason that it is inconsistent with both logic and well-settled doctrine.

Although we do not dispute the proposition that greater powers include lesser ones, we fail to see how that syllogism requires the conclusion that the State's power to regulate commercial *activity* is "greater" than its power to ban truthful, nonmisleading commercial *speech*. Contrary to the assumption made in *Posadas*, we think it quite clear that banning speech may sometimes prove far more intrusive than banning conduct. As a venerable proverb teaches, it may prove more injurious to prevent people from teaching others how to fish than to prevent fish from being sold.[19] Similarly, a local ordinance banning bicycle lessons may curtail freedom far more than one that prohibits bicycle riding within city limits. In short, we reject the assumption that words are necessarily less vital to freedom than actions, or that logic somehow proves that the power to prohibit an activity is necessarily "greater" than the power to suppress speech about it.

---

[19] "Give a man a fish, and you feed him for a day. Teach a man to fish, and you feed him for a lifetime." The International Thesaurus of Quotations 646 (compiled by R. Tripp 1970).

512

As a matter of First Amendment doctrine, the *Posadas* syllogism is even less defensible. The text of the First Amendment makes clear that the Constitution presumes that attempts to regulate speech are more dangerous than attempts to regulate conduct. That presumption accords with the essential role that the free flow of information plays in a democratic society. As a result, the First Amendment directs that government may not suppress speech as easily as it may suppress conduct, and that speech restrictions cannot be treated as simply another means that the government may use to achieve its ends.

These basic First Amendment principles clearly apply to commercial speech; indeed, the *Posadas* majority impliedly conceded as much by applying the *Central Hudson* test. Thus, it is no answer that commercial speech concerns products and services that the government may freely regulate. Our decisions from *Virginia Bd. of Pharmacy* on have made plain that a State's regulation of the sale of goods differs in kind from a State's regulation of accurate information about those goods. The distinction that our cases have consistently drawn between these two types of governmental action is fundamentally incompatible with the absolutist view that the State may ban commercial speech simply because it may constitutionally prohibit the underlying conduct.[20]

---

[20] It is also no answer to say that it would be "strange" if the First Amendment tolerated a seemingly "greater" regulatory measure while forbidding a "lesser" one. We recently held that although the government had the power to proscribe an entire category of speech, such as obscenity or so-called fighting words, it could not limit the scope of its ban to obscene or fighting words that expressed a point of view with which the government disagrees. *R. A. V.* v. *St. Paul*, 505 U. S. 377 (1992). Similarly, in *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410 (1993), we assumed that States could prevent all newsracks from being placed on public sidewalks, but nevertheless concluded that they could not ban only those newsracks that contained certain commercial publications. *Id.*, at 428.

That the State has chosen to license its liquor retailers does not change the analysis. Even though government is under no obligation to provide a person, or the public, a particular benefit, it does not follow that conferral of the benefit may be conditioned on the surrender of a constitutional right. See, *e. g.*, *Frost & Frost Trucking Co.* v. *Railroad Comm'n of Cal.*, 271 U. S. 583, 594 (1926). In *Perry* v. *Sindermann*, 408 U. S. 593 (1972), relying on a host of cases applying that principle during the preceding quarter century, the Court explained that government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech." *Id.*, at 597. That teaching clearly applies to state attempts to regulate commercial speech, as our cases striking down bans on truthful, nonmisleading speech by licensed professionals attest. See, *e. g.*, *Bates* v. *State Bar of Ariz.*, 433 U. S., at 355; *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976).

Thus, just as it is perfectly clear that Rhode Island could not ban all obscene liquor ads except those that advocated temperance, we think it equally clear that its power to ban the sale of liquor entirely does not include a power to censor all advertisements that contain accurate and nonmisleading information about the price of the product. As the entire Court apparently now agrees, the statements in the *Posadas* opinion on which Rhode Island relies are no longer persuasive.

Finally, we find unpersuasive the State's contention that, under *Posadas* and *Edge,* the price advertising ban should be upheld because it targets commercial speech that pertains to a "vice" activity. Respondents premise their request for a so-called "vice" exception to our commercial speech doctrine on language in *Edge* which characterized gambling as a "vice." *Edge*, 509 U. S., at 426; see also *Posadas*, 478 U. S., at 346–347. Respondents misread our precedent. Our decision last Term striking down an alcohol-related advertising

restriction effectively rejected the very contention respondents now make. See *Rubin* v. *Coors Brewing Co.*, 514 U. S., at 478, 482, n. 2.

Moreover, the scope of any "vice" exception to the protection afforded by the First Amendment would be difficult, if not impossible, to define. Almost any product that poses some threat to public health or public morals might reasonably be characterized by a state legislature as relating to "vice activity." Such characterization, however, is anomalous when applied to products such as alcoholic beverages, lottery tickets, or playing cards, that may be lawfully purchased on the open market. The recognition of such an exception would also have the unfortunate consequence of either allowing state legislatures to justify censorship by the simple expedient of placing the "vice" label on selected lawful activities, or requiring the federal courts to establish a federal common law of vice. See Kurland, 1986 S. Ct. Rev., at 15. For these reasons, a "vice" label that is unaccompanied by a corresponding prohibition against the commercial behavior at issue fails to provide a principled justification for the regulation of commercial speech about that activity.

## VII

From 1919 until 1933, the Eighteenth Amendment to the Constitution totally prohibited "the manufacture, sale, or transportation of intoxicating liquors" in the United States and its territories. Section 1 of the Twenty-first Amendment repealed that prohibition, and §2 delegated to the several States the power to prohibit commerce in, or the use of, alcoholic beverages.[21] The States' regulatory power over this segment of commerce is therefore largely "unfettered

---

[21] "Section 2. The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U. S. Const., Amdt. 21, §2.

by the Commerce Clause." *Ziffrin, Inc.* v. *Reeves*, 308 U. S. 132, 138 (1939).

As is clear, the text of the Twenty-first Amendment supports the view that, while it grants the States authority over commerce that might otherwise be reserved to the Federal Government, it places no limit whatsoever on other constitutional provisions. Nevertheless, Rhode Island argues, and the Court of Appeals agreed, that in this case the Twenty-first Amendment tilts the First Amendment analysis in the State's favor. See 39 F. 3d, at 7–8.

In reaching its conclusion, the Court of Appeals relied on our decision in *California* v. *LaRue*, 409 U. S. 109 (1972).[22] In *LaRue*, five Members of the Court relied on the Twenty-first Amendment to buttress the conclusion that the First Amendment did not invalidate California's prohibition of certain grossly sexual exhibitions in premises licensed to serve alcoholic beverages. Specifically, the opinion stated that the Twenty-first Amendment required that the prohibition be given an added presumption in favor of its validity. See *id.*, at 118–119. We are now persuaded that the Court's analysis in *LaRue* would have led to precisely the same result if it had placed no reliance on the Twenty-first Amendment.

Entirely apart from the Twenty-first Amendment, the State has ample power to prohibit the sale of alcoholic beverages in inappropriate locations. Moreover, in subsequent cases, the Court has recognized that the States' inherent police powers provide ample authority to restrict the kind of "bacchanalian revelries" described in the *LaRue* opinion regardless of whether alcoholic beverages are involved. *Id.*, at 118; see, *e. g., Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50 (1976); *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560 (1991). As we recently noted: "*LaRue* did not involve

---

[22] The State also relies on two *per curiam* opinions that followed the Twenty-first Amendment analysis set forth in *LaRue*. See *New York State Liquor Authority* v. *Bellanca*, 452 U. S. 714 (1981), and *Newport* v. *Iacobucci*, 479 U. S. 92 (1986).

commercial speech about alcohol, but instead concerned the regulation of nude dancing in places where alcohol was served." *Rubin* v. *Coors Brewing Co.*, 514 U. S., at 483, n. 2.

Without questioning the holding in *LaRue*, we now disavow its reasoning insofar as it relied on the Twenty-first Amendment. As we explained in a case decided more than a decade after *LaRue*, although the Twenty-first Amendment limits the effect of the dormant Commerce Clause on a State's regulatory power over the delivery or use of intoxicating beverages within its borders, "the Amendment does not license the States to ignore their obligations under other provisions of the Constitution." *Capital Cities Cable, Inc.* v. *Crisp*, 467 U. S. 691, 712 (1984). That general conclusion reflects our specific holdings that the Twenty-first Amendment does not in any way diminish the force of the Supremacy Clause, *ibid.; California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97, 112–114 (1980), the Establishment Clause, *Larkin* v. *Grendel's Den, Inc.*, 459 U. S. 116, 122, n. 5 (1982), or the Equal Protection Clause, *Craig* v. *Boren*, 429 U. S. 190, 209 (1976). We see no reason why the First Amendment should not also be included in that list. Accordingly, we now hold that the Twenty-first Amendment does not qualify the constitutional prohibition against laws abridging the freedom of speech embodied in the First Amendment. The Twenty-first Amendment, therefore, cannot save Rhode Island's ban on liquor price advertising.

## VIII

Because Rhode Island has failed to carry its heavy burden of justifying its complete ban on price advertising, we conclude that R. I. Gen. Laws §§ 3–8–7 and 3–8–8.1 (1987), as well as Regulation 32 of the Rhode Island Liquor Control Administration, abridge speech in violation of the First Amendment as made applicable to the States by the Due Process Clause of the Fourteenth Amendment. The judgment of the Court of Appeals is therefore reversed.

*It is so ordered.*

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I share JUSTICE THOMAS's discomfort with the *Central Hudson* test, which seems to me to have nothing more than policy intuition to support it. I also share JUSTICE STEVENS's aversion towards paternalistic governmental policies that prevent men and women from hearing facts that might not be good for them. On the other hand, it would also be paternalism for us to prevent the people of the States from enacting laws that we consider paternalistic, unless we have good reason to believe that the Constitution itself forbids them. I will take my guidance as to what the Constitution forbids, with regard to a text as indeterminate as the First Amendment's preservation of "the freedom of speech," and where the core offense of suppressing particular political ideas is not at issue, from the long accepted practices of the American people. See *McIntyre* v. *Ohio Elections Comm'n*, 514 U. S. 334, 375 (1995) (SCALIA, J., dissenting).

The briefs and arguments of the parties in the present case provide no illumination on that point; understandably so, since both sides accepted *Central Hudson*. The *amicus* brief on behalf of the American Advertising Federation et al. did examine various expressions of view at the time the First Amendment was adopted; they are consistent with First Amendment protection for commercial speech, but certainly not dispositive. I consider more relevant the state legislative practices prevalent at the time the First Amendment was adopted, since almost all of the States had free speech constitutional guarantees of their own, whose meaning was not likely to have been different from the federal constitutional provision derived from them. Perhaps more relevant still are the state legislative practices at the time the Fourteenth Amendment was adopted, since it is most improbable that that adoption was meant to overturn any existing national consensus regarding free speech. Indeed, it is rare that any nationwide practice would develop contrary to a proper understanding of the First Amendment

itself—for which reason I think also relevant any national consensus that had formed regarding state regulation of advertising *after* the Fourteenth Amendment, and before this Court's entry into the field. The parties and their *amici* provide no evidence on these points.

Since I do not believe we have before us the wherewithal to declare *Central Hudson* wrong—or at least the wherewithal to say what ought to replace it—I must resolve this case in accord with our existing jurisprudence, which all except JUSTICE THOMAS agree would prohibit the challenged regulation. I am not disposed to develop new law, or reinforce old, on this issue, and accordingly I merely concur in the judgment of the Court. I believe, however, that JUSTICE STEVENS's treatment of the application of the Twenty-first Amendment to this case is correct, and accordingly join Parts I, II, VII, and VIII of JUSTICE STEVENS's opinion.

JUSTICE THOMAS, concurring in Parts I, II, VI, and VII, and concurring in the judgment.

In cases such as this, in which the government's asserted interest is to keep legal users of a product or service ignorant in order to manipulate their choices in the marketplace, the balancing test adopted in *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980), should not be applied, in my view. Rather, such an "interest" is *per se* illegitimate and can no more justify regulation of "commercial" speech than it can justify regulation of "non-commercial" speech.

I

In *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 762 (1976), this Court held that speech that does "'no more than propose a commercial transaction'" was protected by the First Amendment, and struck down a ban on price advertising regarding prescription drugs. The Court asserted that a "particular consumer's interest in the free flow of commercial information" may

be as keen as, or keener than, his interest in "the day's most urgent political debate," *id.*, at 763, and that "the proper allocation of resources" in our free enterprise system requires that consumer decisions be "intelligent and well informed," *id.*, at 765. The Court also explained that, unless consumers are kept informed about the operations of the free market system, they cannot form "intelligent opinions as to how that system ought to be regulated or altered." *Ibid.* See also *id.*, at 765–766, nn. 19–20.[1] The Court sharply rebuffed the State's argument that consumers would make irresponsible choices if they were able to choose between higher priced but higher quality pharmaceuticals accompanied by high quality prescription monitoring services resulting from a "stable pharmacist-customer relationshi[p]," *id.*, at 768, on the one hand, and cheaper but lower quality pharmaceuticals unaccompanied by such services, on the other:

> "[T]he State's protectiveness of its citizens rests in large measure on the advantages of their being kept in ignorance. The advertising ban does not directly affect professional standards one way or the other. It affects them only through the reactions it is assumed people will have to the free flow of drug price information.
>
> .      .      .      .      .
>
> "There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests, if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them. . . . It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the

---

[1] Accord, *Virginia Bd. of Pharmacy*, 425 U. S., at 780, n. 8 (Stewart, J., concurring) (information about price and products conveyed by advertising may stimulate thought and debate about political questions).

First Amendment makes for us.  Virginia is free to require whatever professional standards it wishes of its pharmacists; it may subsidize them or protect them from competition in other ways.  But it may not do so by keeping the public in ignorance of the entirely lawful terms that competing pharmacists are offering.  In this sense, the justifications Virginia has offered for suppressing the flow of prescription drug price information, far from persuading us that the flow is not protected by the First Amendment, have reinforced our view that it is."  *Id.,* at 769–770 (citation omitted).

The Court opined that *false or misleading* advertising was not protected, on the grounds that the accuracy of advertising claims may be more readily verifiable than is the accuracy of political or other claims, and that "commercial" speech is made more durable by its profit motive.  *Id.,* at 771, and n. 24.  The Court also made clear that it did not envision protection for advertising that proposes an illegal transaction.  *Id.,* at 772–773 (distinguishing *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations,* 413 U. S. 376 (1973)).

In case after case following *Virginia Bd. of Pharmacy,* the Court, and individual Members of the Court, have continued to stress the importance of free dissemination of information about commercial choices in a market economy; the antipaternalistic premises of the First Amendment; the impropriety of manipulating consumer choices or public opinion through the suppression of accurate "commercial" information; the near impossibility of severing "commercial" speech from speech necessary to democratic decisionmaking; and the dangers of permitting the government to do covertly what it might not have been able to muster the political support to do openly.[2]

---

[2] See *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 96–97 (1977); *Bates* v. *State Bar of Ariz.,* 433 U. S. 350, 364–365, 368–369, 374–375, 376–377 (1977); *Friedman* v. *Rogers,* 440 U. S. 1, 8–9 (1979); *id.,* at 23–24

In other decisions, however, the Court has appeared to accept the legitimacy of laws that suppress information in order to manipulate the choices of consumers—so long as the government could show that the manipulation was in fact successful. *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980), was the first decision to clearly embrace this position, although the Court applied a very strict overbreadth analysis to strike down the advertising ban at issue.[3] In two other decisions, *Posadas de Puerto Rico Associates* v. *Tourism Co. of P. R.*, 478 U. S. 328 (1986), and *United States* v. *Edge Broadcasting Co.*, 509 U. S. 418 (1993), the Court simply presumed that advertising of a product or service leads to increased consumption; since, as in *Central Hudson*, the Court saw nothing impermissible in the government's suppressing information in order to discourage consumption, it upheld the advertising restrictions

---

(Blackmun, J., for two Justices, concurring in part and dissenting in part); *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 561–562 (1980); *id.*, at 566, n. 9; *id.*, at 575 (Blackmun, J., joined by Brennan, J., concurring in judgment); *id.*, at 581 (STEVENS, J., also joined by Brennan, J., concurring in judgment); *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 79 (1983) (REHNQUIST, J., for two Justices, concurring in judgment); *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626, 646 (1985); *Posadas de Puerto Rico Associates* v. *Tourism Co. of P. R.*, 478 U. S. 328, 350–351, 358 (1986) (Brennan, J., for three Justices, dissenting); *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 421–422, n. 17 (1993); *id.*, at 432 (Blackmun, J., concurring); *Edenfield* v. *Fane*, 507 U. S. 761, 767, 770 (1993); *United States* v. *Edge Broadcasting Co.*, 509 U. S. 418, 437–439, and nn. 1, 3, 4 (1993) (STEVENS, J., for two Justices, dissenting); *Ibanez* v. *Florida Dept. of Business and Professional Regulation, Bd. of Accountancy*, 512 U. S. 136, 142–143 (1994); *Rubin* v. *Coors Brewing Co.*, 514 U. S. 476, 481–482 (1995); *id.*, at 492–493, 494 (STEVENS, J., concurring in judgment); *Florida Bar* v. *Went For It, Inc.*, 515 U. S. 618, 639–640, 644–645 (1995) (KENNEDY, J., for four Justices, dissenting).

[3] The Court found that although the total effect of the advertising ban would be to decrease consumption, the advertising ban impermissibly extended to some advertising that itself might not increase consumption. *Central Hudson, supra*, at 569–571.

in those cases.  *Posadas, supra,* at 341–342; *Edge, supra,* at 425, 433–434.

The Court has at times appeared to assume that "commercial" speech could be censored in a variety of ways for any of a variety of reasons because, as was said without clear rationale in some post-*Virginia Bd. of Pharmacy* cases, such speech was in a "subordinate position in the scale of First Amendment values," *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S. 447, 456 (1978); *Board of Trustees of State Univ. of N. Y.* v. *Fox,* 492 U. S. 469, 478 (1989); *Florida Bar* v. *Went For It, Inc.,* 515 U. S. 618, 623 (1995), or of "less constitutional moment," *Central Hudson, supra,* at 562–563, n. 5.  But see *Cincinnati* v. *Discovery Network, Inc.,* 507 U. S. 410, 418–419 (1993) (rejecting this assertion); *id.,* at 431 (Blackmun, J., concurring) (same).  I do not see a philosophical or historical basis for asserting that "commercial" speech is of "lower value" than "noncommercial" speech.  Indeed, some historical materials suggest to the contrary.  See, *e. g., ante,* at 495–496 (citing Franklin's Apology for Printers); *Ex parte Jackson,* 96 U. S. 727, 733 (1878) (dictum that Congress could not, consistent with freedom of the press, prevent the circulation of lottery advertising through methods other than the United States mail); see also *In re Rapier,* 143 U. S. 110, 134–135 (1892) (continuing to assume that freedom of the press prevents Congress from prohibiting circulation of newspapers containing lottery advertisements); *Lewis Publishing Co.* v. *Morgan,* 229 U. S. 288, 315 (1913) (same); see generally Brief for American Advertising Federation et al. as *Amici Curiae* 12–24 (citing authorities for propositions that commercial activity and advertising were integral to life in colonial America and that Framers' political philosophy equated liberty and property and did not distinguish between commercial and noncommercial messages).  Nor do I believe that the only explanations that the Court has ever advanced for treating "commercial" speech differently from other speech can justify restricting "commercial" speech in

order to keep information from legal purchasers so as to thwart what would otherwise be their choices in the marketplace.[4]

## II

I do not join the principal opinion's application of the *Central Hudson* balancing test because I do not believe that such a test should be applied to a restriction of "commercial" speech, at least when, as here, the asserted interest is one that is to be achieved through keeping would-be recipients of the speech in the dark.[5] Application of the advancement-of-state-interest prong of *Central Hudson* makes little sense to me in such circumstances. Faulting the State for failing to show that its price advertising ban decreases alcohol consumption "significantly," as JUSTICE STEVENS does, *ante*, at 507 (emphasis deleted), seems to imply that if the State had been *more successful* at keeping consumers ignorant and thereby decreasing their consumption, then the restriction might have been upheld. This contradicts *Virginia Bd. of*

---

[4] As noted above, the asserted rationales for differentiating "commercial" speech from other speech are (1) that the truth of "commercial" speech is supposedly more verifiable, and (2) that "commercial speech, the offspring of economic self-interest" is supposedly a "hardy breed of expression that is not particularly susceptible to being crushed by overbroad regulation." *Central Hudson, supra*, at 564, n. 6 (internal quotation marks omitted). The degree to which these rationales truly justify treating "commercial" speech differently from other speech (or indeed, whether the requisite distinction can even be drawn) is open to question, in my view. See Kozinski & Banner, Who's Afraid of Commercial Speech, 76 Va. L. Rev. 627, 634–638 (1990) (questioning basis for drawing distinction); *id.*, at 638–650 (questioning coherence of distinction). In any event, neither of these rationales provides any basis for permitting government to keep citizens ignorant as a means of manipulating their choices in the commercial or political marketplace.

[5] In other words, I do not believe that a *Central Hudson*-type balancing test should apply when the asserted purpose is like the one put forth by the government in *Central Hudson* itself. Whether some type of balancing test is warranted when the asserted state interest is of a different kind is a question that I do not consider here.

*Pharmacy's* rationale for protecting "commercial" speech in the first instance.

Both JUSTICE STEVENS and JUSTICE O'CONNOR appear to adopt a stricter, more categorical interpretation of the fourth prong of *Central Hudson* than that suggested in some of our other opinions,[6] one that could, as a practical matter, go a long way toward the position I take. The State argues that keeping information about lower priced alcohol from consumers will tend to raise the total price of alcohol to consumers (defined as money price plus the costs of searching out lower priced alcohol, see Brief for Respondents 23), thus discouraging alcohol consumption. In their application of the fourth prong, both JUSTICE STEVENS and JUSTICE O'CONNOR hold that because the State can ban the sale of lower priced alcohol altogether by instituting minimum prices or levying taxes, it cannot ban advertising regarding lower priced liquor. Although the tenor of JUSTICE O'CONNOR's opinion (and, to a lesser extent, that of JUSTICE STEVENS' opinion) might suggest that this is just another routine case-by-case application of *Central Hudson's* fourth prong, the Court's holding will in fact be quite sweeping if applied consistently in future cases. The opinions would appear to commit the courts to striking down restrictions on speech whenever a direct regulation (*i. e.*, a regulation involving no restriction on speech regarding lawful activity at all) would be an equally effective method of dampening demand by legal users. But it would seem that directly banning a product (or rationing it, taxing it, controlling its price, or otherwise restricting its sale in specific ways) would virtually always be at least as effective in discouraging consumption as merely restricting advertising regarding the product would be, and thus virtually all restrictions with such a purpose would fail the fourth prong of the *Central Hudson* test.

[6] *E. g., Cincinnati* v. *Discovery Network,* 507 U. S., at 417, n. 13 (commercial speech restrictions impermissible if alternatives are "numerous" and obvious).

This would be so even if the direct regulation is, in one sense, more restrictive of *conduct* generally. In this case, for example, adoption of minimum prices or taxes will mean that those who, under the current legal system, would have happened across cheap liquor or would have sought it out, will be forced to pay more. Similarly, a State seeking to discourage liquor sales would have to ban sales by convenience stores rather than banning convenience store liquor advertising; it would have to ban liquor sales after midnight, rather than banning advertising by late-night liquor sellers; and so on.

The upshot of the application of the fourth prong in the opinions of JUSTICE STEVENS and of JUSTICE O'CONNOR seems to be that the government may not, for the purpose of keeping would-be consumers ignorant and thus decreasing demand, restrict advertising regarding commercial transactions—or at least that it may not restrict advertising regarding commercial transactions except to the extent that it outlaws or otherwise directly restricts the same transactions within its own borders.[7] I welcome this outcome; but,

---

[7] The two most obvious situations in which no equally effective direct regulation will be available for discouraging consumption (and thus, the two situations in which the Court and I might differ on the outcome) are: (1) When a law directly regulating conduct would violate the Constitution (*e. g.*, because the item is constitutionally protected), or (2) when the sale is to occur outside the State's borders.

As to the first situation: Although the Court's application of the fourth prong today does not specifically foreclose regulations or bans of advertising regarding items that cannot constitutionally be banned, it would seem strange to hold that the government's power to interfere with transmission of information regarding these items, in order to dampen demand for them, is more extensive than its power to restrict, for the same purpose, advertising of items that are not constitutionally protected. Cf. *Bigelow* v. *Virginia*, 421 U. S. 809, 822 (1975).

As to the second situation: When a State seeks to dampen consumption by its citizens of products or services outside its borders, it does not have the option of direct regulation. Here, a respondent correctly points out that alternatives such as taxes will *not* be effective in discouraging sales

rather than "applying" the fourth prong of *Central Hudson* to reach the inevitable result that all or most such advertising restrictions must be struck down, I would adhere to the doctrine adopted in *Virginia Bd. of Pharmacy* and in Justice Blackmun's *Central Hudson* concurrence, that all attempts to dissuade legal choices by citizens by keeping them ignorant are impermissible.

## III

Although the Court took a sudden turn away from *Virginia Bd. of Pharmacy* in *Central Hudson*, it has never explained why manipulating the choices of consumers by keeping them ignorant is more legitimate when the ignorance is maintained through suppression of "commercial" speech than when the same ignorance is maintained through suppression of "noncommercial" speech. The courts, including this

---

to Rhode Island residents of lower priced alcohol outside the State, see Brief for Respondent Rhode Island Liquor Stores Association 27; yet the Court strikes down the ban against price advertising even as applied to out-of-state liquor sellers such as petitioner Peoples Super Liquor Stores. Perhaps JUSTICE STEVENS and JUSTICE O'CONNOR would distinguish a situation in which a State had actually banned sales of lower priced alcohol within the State and had then, through a ban of advertising by out-of-state sellers, sought to keep residents ignorant of the fact that lower priced alcohol was legally available in other States. Cf. *United States* v. *Edge Broadcasting Co.*, 509 U. S. 418 (1993). See *ante*, at 508–510.

The outcome in *Edge* may well be in conflict with the principles espoused in *Virginia Bd. of Pharmacy* and ratified by me today. See *Edge, supra*, at 436–439 (STEVENS, J., dissenting). (In *Edge*, respondent did not put forth the broader principles adopted in *Virginia Bd. of Pharmacy*, but rather argued that the advertising restriction did not have a sufficiently close fit under *Central Hudson*.) Because the issue of restrictions on advertising of products or services to be purchased legally outside a State that has itself banned or regulated the same purchases within the State is not squarely presented in this case, I will not address here whether the decision in *Edge* can be reconciled with the position I take today.

Court, have found the *Central Hudson* "test" to be, as a general matter, very difficult to apply with any uniformity.[8] This may result in part from the inherently nondeterminative nature of a case-by-case balancing "test" unaccompanied by any categorical rules, and the consequent likelihood that individual judicial preferences will govern application of the test.[9] Moreover, the second prong of *Central Hudson*, as applied to the facts of that case and to those here, apparently

---

[8] See, *e. g.*, Kozinski & Banner, 76 Va. L. Rev., at 630–631 (citing cases); Wright, Freedom and Culture: Why We Should Not Buy Commercial Speech, 72 Denver U. L. Rev. 137, 162–166 (1994) (citing cases); Kasakove, *New York State Association of Realtors, Inc.* v. *Shaffer*: When the Second Circuit Chooses Between Free Speech and Fair Housing, Who Wins?, 61 Brooklyn L. Rev. 397, 409–410, and nn. 71, 73, 418 (1995); Note, *Dunagin* v. *City of Oxford*: Mississippi's Suppression of Liquor Advertising, 63 Detroit L. Rev. 175, 184–187 (1985); Faille, Spinning the Roulette Wheel: Commercial Speech and Philosophical Cogency, Fed. B. N. & J. 58, 60–62 (1994); Margulies, Connecticut's Free Speech Clauses: A Framework and an Agenda, 65 Conn. Bar J. 437, 440, n. 20 (1991) (citing cases).

[9] The third prong of *Central Hudson* is far from a mechanical one. In *Posadas, Edge,* and other cases, the Court has presumed that advertising bans decrease consumption. Here, by contrast, the principal opinion demands *proof* of a "significant" decrease in consumption, and finds it lacking. But petitioners' own expert testified at one point that, taking into account disposable income, price was a "potent" influence on alcohol consumption, see App. 79; and the American Medical Association had apparently concluded that advertising of alcohol in general increased total alcohol consumption sufficiently to make a ban on advertising worthwhile, see *44 Liquor Mart, Inc.* v. *Racine*, 829 F. Supp. 543, 548 (RI 1993). A court more inclined to uphold the ban here could have pointed to these facts in support.

The courts have also had difficulty applying the fourth prong because the outcome has depended upon the level of generality with which the interest was described. See Faille, *supra*, at 58, 60. If today's strict application of the fourth prong survives, it will clarify the prong's application in a large number of cases, since, as noted above, it will simply invalidate most restrictions in which the government attempts to manipulate consumption through enforced ignorance rather than through direct regulation.

requires judges to delineate those situations in which citizens cannot be trusted with information, and invites judges to decide whether they themselves think that consumption of a product is harmful enough that it *should* be discouraged.[10] In my view, the *Central Hudson* test asks the courts to weigh incommensurables—the value of knowledge versus the value of ignorance—and to apply contradictory premises—that informed adults are the best judges of their own interests, and that they are not. Rather than continuing to apply a test that makes no sense to me when the asserted state interest is of the type involved here, I would return to the reasoning and holding of *Virginia Bd. of Pharmacy.* Under that decision, these restrictions fall.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE SOUTER, and JUSTICE BREYER join, concurring in the judgment.

Rhode Island prohibits advertisement of the retail price of alcoholic beverages, except at the place of sale. The State's only asserted justification for this ban is that it promotes temperance by increasing the cost of alcoholic beverages. Brief for Respondent State of Rhode Island 22. I agree with the Court that Rhode Island's price-advertising ban is invalid. I would resolve this case more narrowly, however, by applying our established *Central Hudson* test to determine whether this commercial speech regulation survives First Amendment scrutiny.

Under that test, we first determine whether the speech at issue concerns lawful activity and is not misleading, and whether the asserted governmental interest is substantial. If both these conditions are met, we must decide whether the regulation "directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Central Hudson Gas & Elec.*

---

[10] See *ante,* at 514 (noting that scope of any "vice" category of products would be difficult to define).

*Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 566 (1980).

Given the means by which this regulation purportedly serves the State's interest, our conclusion is plain: Rhode Island's regulation fails First Amendment scrutiny.

Both parties agree that the first two prongs of the *Central Hudson* test are met. Even if we assume, *arguendo*, that Rhode Island's regulation also satisfies the requirement that it directly advance the governmental interest, Rhode Island's regulation fails the final prong; that is, its ban is more extensive than necessary to serve the State's interest.

As we have explained, in order for a speech restriction to pass muster under the final prong, there must be a fit between the legislature's goal and method, "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U. S. 469, 480 (1989) (internal quotation marks omitted). While the State need not employ the least restrictive means to accomplish its goal, the fit between means and ends must be "narrowly tailored." *Ibid.* The scope of the restriction on speech must be reasonably, though it need not be perfectly, targeted to address the harm intended to be regulated. See *Florida Bar* v. *Went For It, Inc.*, 515 U. S. 618, 632–634 (1995). The State's regulation must indicate a "carefu[l] calculat[ion of] the costs and benefits associated with the burden on speech imposed by its prohibition." *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 417 (1993) (internal quotation marks omitted). The availability of less burdensome alternatives to reach the stated goal signals that the fit between the legislature's ends and the means chosen to accomplish those ends may be too imprecise to withstand First Amendment scrutiny. See *Rubin* v. *Coors Brewing Co.*, 514 U. S. 476, 486–487 (1995); *Cincinnati, supra,* at 417, n. 13. If alternative channels permit communication of the restricted speech, the regulation is

more likely to be considered reasonable.  See *Florida Bar, supra,* at 632–634.

Rhode Island offers one, and only one, justification for its ban on price advertising.  Rhode Island says that the ban is intended to keep alcohol prices high as a way to keep consumption low.  By preventing sellers from informing customers of prices, the regulation prevents competition from driving prices down and requires consumers to spend more time to find the best price for alcohol.  Brief for Respondent State of Rhode Island 22.  The higher cost of obtaining alcohol, Rhode Island argues, will lead to reduced consumption.

The fit between Rhode Island's method and this particular goal is not reasonable.  If the target is simply higher prices generally to discourage consumption, the regulation imposes too great, and unnecessary, a prohibition on speech in order to achieve it.  The State has other methods at its disposal— methods that would more directly accomplish this stated goal without intruding on sellers' ability to provide truthful, nonmisleading information to customers.  Indeed, Rhode Island's own expert conceded that "'the objective of lowering consumption of alcohol by banning price advertising could be accomplished by establishing minimum prices and/or by increasing sales taxes on alcoholic beverages.'"  39 F. 3d 5, 7 (CA1 1994).  A tax, for example, is not normally very difficult to administer and would have a far more certain and direct effect on prices, without any restriction on speech. The principal opinion suggests further alternatives, such as limiting per capita purchases or conducting an educational campaign about the dangers of alcohol consumption.  *Ante,* at 507.  The ready availability of such alternatives—at least some of which would far more effectively achieve Rhode Island's only professed goal, at comparatively small additional administrative cost—demonstrates that the fit between ends and means is not narrowly tailored.  Too, this regulation prevents sellers of alcohol from communicating price information anywhere but at the point of purchase.  No channels

exist at all to permit them to publicize the price of their products.

Respondents point for support to *Posadas de Puerto Rico Associates* v. *Tourism Co. of P. R.*, 478 U. S. 328 (1986), where, applying the *Central Hudson* test, we upheld the constitutionality of a Puerto Rico law that prohibited the advertising of casino gambling aimed at residents of Puerto Rico, but permitted such advertising aimed at tourists.

The Court there accepted as reasonable the legislature's belief that the regulation would be effective, and concluded that, because the restriction affected only advertising of casino gambling aimed at residents of Puerto Rico, not that aimed at tourists, the restriction was narrowly tailored to serve Puerto Rico's interest. 478 U. S., at 341–344. The Court accepted without question Puerto Rico's account of the effectiveness and reasonableness of its speech restriction. Respondents ask us to make a similar presumption here to uphold the validity of Rhode Island's law.

It is true that *Posadas* accepted as reasonable, without further inquiry, Puerto Rico's assertions that the regulations furthered the government's interest and were no more extensive than necessary to serve that interest. Since *Posadas*, however, this Court has examined more searchingly the State's professed goal, and the speech restriction put into place to further it, before accepting a State's claim that the speech restriction satisfies First Amendment scrutiny. See, *e. g., Florida Bar* v. *Went For It, Inc., supra; Rubin* v. *Coors Brewing Co., supra; Ibanez* v. *Florida Dept. of Business and Professional Regulation, Bd. of Accountancy*, 512 U. S. 136 (1994); *Edenfield* v. *Fane*, 507 U. S. 761 (1993); *Cincinnati* v. *Discovery Network, Inc., supra.* In each of these cases we declined to accept at face value the proffered justification for the State's regulation, but examined carefully the relationship between the asserted goal and the speech restriction used to reach that goal. The closer look that we have required since *Posadas* comports better with the purpose of

the analysis set out in *Central Hudson,* by requiring the State to show that the speech restriction directly advances its interest and is narrowly tailored. Under such a closer look, Rhode Island's price-advertising ban clearly fails to pass muster.

Because Rhode Island's regulation fails even the less stringent standard set out in *Central Hudson,* nothing here requires adoption of a new analysis for the evaluation of commercial speech regulation. The principal opinion acknowledges that "even under the less than strict standard that generally applies in commercial speech cases, the State has failed to establish a reasonable fit between its abridgment of speech and its temperance goal." *Ante,* at 507 (internal quotation marks omitted). Because we need go no further, I would not here undertake the question whether the test we have employed since *Central Hudson* should be displaced.

Respondents argue that an additional factor, the Twenty-first Amendment, tips the First Amendment analysis in Rhode Island's favor.

The Twenty-first Amendment repealed the prohibition on the manufacture, sale, or transportation of intoxicating liquors that had been established by the Eighteenth Amendment. Section 2 of the Twenty-first Amendment created an exception to the normal operation of the Commerce Clause, to permit States to prohibit commerce in, or the use of, alcoholic beverages. *Craig* v. *Boren,* 429 U. S. 190, 206 (1976).

In its examination of Rhode Island's statute, the Court of Appeals erroneously concluded that the Twenty-first Amendment provided an "added presumption in favor of the validity of the state regulation." 39 F. 3d, at 7–9 (internal quotation marks omitted). The Twenty-first Amendment cannot save an otherwise invalid restriction on speech.

Nothing in the Amendment's text or history justifies its use to alter the application of the First Amendment. "[O]ur prior cases have made clear that the [Twenty-first] Amend-

ment does not license the States to ignore their obligations under other provisions of the Constitution." *Capital Cities Cable, Inc.* v. *Crisp,* 467 U. S. 691, 712 (1984). See also *Larkin* v. *Grendel's Den, Inc.,* 459 U. S. 116, 122, n. 5 (1982) ("The State may not exercise its power under the Twenty-first Amendment in a way which impinges upon the Establishment Clause of the First Amendment"); *Craig, supra,* at 206 ("Neither the text nor the history of the Twenty-first Amendment suggests that it qualifies individual rights protected by the Bill of Rights and the Fourteenth Amendment where the sale or use of liquor is concerned" (internal quotation marks omitted)). The Twenty-first Amendment does not trump First Amendment rights or add a presumption of validity to a regulation that cannot otherwise satisfy First Amendment requirements.

The Court of Appeals relied on *California* v. *LaRue,* 409 U. S. 109, 118–119 (1972), for its determination that the Twenty-first Amendment provided an "added presumption" of the regulation's validity. There, this Court upheld a State's regulations prohibiting establishments licensed to sell liquor by the drink from offering explicitly sexual entertainment. As we recently explained in *Coors,* "*LaRue* did not involve commercial speech about alcohol, but instead concerned the regulation of nude dancing in places where alcohol was served." 514 U. S., at 483, n. 2. The cases following *LaRue* similarly involved the regulation of nude or nearly nude dancing in establishments licensed to serve alcohol. *New York State Liquor Authority* v. *Bellanca,* 452 U. S. 714 (1981) *(per curiam); Newport* v. *Iacobucci,* 479 U. S. 92 (1986) *(per curiam).* Nothing in *LaRue* suggested that the Twenty-first Amendment would permit a State to prohibit the kind of speech at issue here, and as discussed above, the text and history of the Twenty-first Amendment clearly indicate that the Amendment was *not* intended to supplant the general application of constitutional provisions, except for its limited exception to the Commerce Clause's normal

operation. Indeed, *LaRue* notes that prior decisions "did not go so far as to hold or say that the Twenty-first Amendment supersedes all other provisions of the United States Constitution in the area of liquor regulations," 409 U. S., at 115, and *LaRue* certainly does not stand for that proposition. The Court of Appeals' reliance on *LaRue* was misplaced.

Rhode Island's prohibition on alcohol-price advertising, as a means to keep alcohol prices high and consumption low, cannot survive First Amendment scrutiny. The Twenty-first Amendment cannot save this otherwise invalid regulation. While I agree with the Court's finding that the regulation is invalid, I would decide that issue on narrower grounds. I therefore concur in the judgment.